[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 556 
Kevin Aldridge sued Alabama Power Company ("APCo"), alleging that APCo discharged him in retaliation for his filing a claim for workers' compensation benefits. After a trial, the jury returned a $500,000 verdict in favor of Aldridge; the verdict awarded $250,000 in compensatory damages and $250,000 in punitive damages. APCo filed motions for a judgment *Page 557 
as a matter of law ("JML") at the close of Aldridge's evidence, at the close of all the evidence, and again after the trial court had entered a judgment on the verdict. The trial court denied those motions. APCo appeals. We reverse and remand.
 I. Factual Background
Aldridge worked for APCo from 1978 until 1998. During those years, he worked his way up from what he refers to as the "hard crew" to lead lineman. As a lead lineman, he held a supervisory position and was within the highest pay classification of the International Brotherhood of Electrical Workers, the electrical workers union. Aldridge alleged that in May 1996 he injured his neck on the job; he underwent surgery to correct this injury. As a result of that injury, Aldridge made a claim for workers' compensation benefits, which APCo denied, and in September 1996 he sued APCo for workers' compensation benefits. The claim for benefits remains pending before the trial court. By agreement of the parties, the resolution of the workers' compensation action has been deferred until the conclusion of this retaliatory-discharge action.
From May 1996 to January 1997, Aldridge did not work because of his injury and subsequent recovery from surgery. When he returned to work in January 1997, APCo placed Aldridge in its customer-service center. Aldridge left the position after three days, claiming that he experienced severe pain from sitting all day. Aldridge then applied for and received long-term disability benefits. APCo alleges that its disability management section attempted numerous times to return Aldridge to work. Aldridge denies that it did so and claims that he unsuccessfully tried to pursue job opportunities with APCo. During this period, Aldridge started his own "car-hauling business." The business ultimately failed, a fact APCo claims caused Aldridge to cooperate with its efforts to find him physically suitable employment.
In November 1997, almost one and one-half years after his neck injury, Aldridge accepted APCo's offer of a meter-reader position in Fort Deposit. On December 2, 1997, Aldridge began training for the job. Three days later, Aldridge injured his knee. Aldridge claims that the injury occurred while he was on his meter-reading walking route. Aldridge sought medical attention for his injury, and APCo would not let him return to work without medical clearance. His doctor cleared him to return to work on January 21, 1998.
Aldridge began working as a part-time driver for Material Delivery Service, Inc. ("MDS"), during the period that he was not medically cleared to return to work at APCo. Aldridge's job at MDS required him to work long hours and sometimes required work that appeared to be outside the physical limitations placed on him by his doctor after his knee injury. Aldridge never told APCo that he was working for MDS; when the doctor cleared him to work and he began to work for APCo again in January, he continued to work at MDS.
On January 21, 1998, Aldridge returned to his work as a meter reader. He was 30 minutes late for work on the first day, however, because of a traffic accident. Aldridge explained his tardiness to his supervisor, Robin Ray, and offered to stay 30 minutes longer at the end of the day to make up the time. Ray accepted Aldridge's offer. The next day, Aldridge did not appear for work. He claims that his knee was hurting when he woke up and that he attempted to call in sick. He said that he was unable to get anyone's voice mail, and that he took a muscle relaxer and went back to bed. Charlie Britton, with the human resources department at *Page 558 
APCo, spoke by telephone to Aldridge later that day. Aldridge told Britton of his knee injury, and Britton instructed him to visit Dr. Kirven Ulmer that afternoon for a fitness-for-duty examination. APCo asserts that Aldridge was an hour late to this appointment; Aldridge insists he was told that the appointment was an hour later than it actually was. Dr. Ulmer ordered a magnetic-resonance-imaging test performed on Aldridge's knee the next day, and APCo placed Aldridge on light-duty status until the results came in. On January 28, 1998, Dr. Ulmer cleared Aldridge to return to his meter-reader position. During his absence from APCo, Aldridge continued to work for MDS.
Aldridge returned to work at APCo on January 29. On that day, Ray issued Aldridge a first-level discipline notice for his tardiness on January 21 and his absence on January 22. On February 9, 1998, Aldridge telephoned Ray to ask for the day off, stating that his son had wrecked one of Aldridge's automobiles the day before and that he needed to take it to get an estimate for the repairs. Ray agreed to allow Aldridge to take the day off, and Aldridge received the day off without pay. According to Aldridge's testimony, the shop where the car was to be repaired was very busy that morning, and between 11:00 and 11:30 a.m. he found out that the car could not be repaired that day. Aldridge said he then decided to go to MDS and pick up a shift for the rest of the day.[1]
Aldridge explained that he did not report at work at APCo that afternoon because he was in a training position and he knew that many meter readers worked only in the mornings. Ray acknowledged that employees who miss half a day do not have to come in to finish the day. Aldridge worked for MDS that day from 12:30 to 9:30 p.m.
On February 17, 1998, Aldridge telephoned APCo and left the following voice message:
 "Jean, this is Kevin Aldridge. How about telling Robin [Ray] that that storm came through last night took some shingles off my roof. I've got to get it covered up before everything I've got in my house ruins and I'll be in in the morning."
Ray telephoned her supervisor, Creagh Webb, when she received Aldridge's message. Webb told Ray to go to Aldridge's house to verify his excuse. Ray arrived at Aldridge's home around 11:00 a.m. She said that she did not knock on the door, however, because she feared Aldridge's rottweiler dog, which was barking. Ray left but returned to Aldridge's house two more times that day, finally seeing Aldridge around 3:35 p.m. as he pulled into the driveway. Ray says that Aldridge told her that he had been at home all day, without electricity, waiting in vain for his insurance adjuster to come inspect the roof. Ray also says that Aldridge represented that he had "put back together" his roof "for now." Aldridge claims that he left the house only to pick his children up from school.
On February 18, Webb interviewed Aldridge about his absence the previous day. Aldridge told Webb about his roof and said that he had been at home all day waiting for the insurance adjuster. Webb said that Aldridge changed his story during the interview and that he became suspicious of the veracity of Aldridge's statements. Later that day, Webb initiated an internal *Page 559 
investigation of Aldridge's February 17 absence.
On February 18, Pat Cagle, with APCo's corporate security department, interviewed Aldridge about his February 17 absence. After the interview, Cagle drafted a written statement that reflected Aldridge's comments during the interview. Aldridge refused to sign the statement. Cagle and Aldridge, along with Aldridge's union representative, then drove to Aldridge's house to investigate the status of the roof. Cagle photographed the area Aldridge designated as having been damaged by the storm and saw four missing shingles. The affected area of the roof was not covered by a tarp. On February 19, Cagle interviewed Aldridge's insurance agent, who stated that he had never scheduled an appointment for Aldridge's insurance adjuster, Hugh Patterson, to inspect the roof. Cagle also questioned Patterson, who confirmed that no appointment had been made. Aldridge explains this circumstance by stating that his wife had talked to the representative of the insurance company and that from their conversation he assumed that an appointment had been made.
Cagle delivered his report to Webb on February 26. After reading Cagle's findings, Webb decided to investigate Aldridge's absence on February 9, the date upon which he had asked to be off to get a repair estimate on his wrecked car. On February 27, Aldridge won a bid for a meter-reader position in Tallassee and was consequently transferred from Webb's supervision. Despite this transfer, the investigation into Aldridge's February 9 absence continued.
On February 27, Cagle interviewed Aldridge about his February 9 absence. Aldridge told Cagle that he went to MDS to visit his brother, an MDS employee, that afternoon and that he went home when it was "beginning to get dark." Cagle again presented Aldridge a written statement summarizing their conversation, which Aldridge again refused to sign. Aldridge asserts that it was at this interview that Cagle asked Aldridge if he worked for MDS. APCo contends that this topic was not discussed with Aldridge until March 16.
Cagle continued his investigation by interviewing Bruce Werbach, the terminal manager of MDS, and speaking with a representative of McKinnon Motors, where Aldridge said he had gone for repairs on his car. On March 16, Cagle interviewed Aldridge again in order to have Aldridge explain the inconsistencies in his February 27 interview. According to APCo, Cagle told Aldridge that APCo knew that he was working for MDS, and he asked Aldridge to sign a release giving APCo access to his MDS driving records. Aldridge refused the request, but he admitted that he worked for MDS. Webb joined the meeting, asked Aldridge to sign the release, and told him that APCo currently had enough information in his file to discharge him. Aldridge contends that he told Webb about his workers' compensation claim against APCo at this meeting; however, at trial, Webb did not remember being told of Aldridge's workers' compensation claim at that time. Aldridge also asserts that he attempted to tape-record these meetings but that Cagle would not allow it, citing APCo policy. Aldridge refused Webb's request that he sign the release. Webb told Aldridge to stay home on March 17, with pay, and to decide whether he was going to sign the release.
After this meeting, Cagle gave Webb his report on Aldridge's absences. Webb consulted this report and William Killian, of APCo's human resources department, in considering Aldridge's status with APCo. On March 18, Webb and Cagle again met *Page 560 
with Aldridge and his union representative. Webb asked Aldridge for the release, explaining that APCo needed the information to which the release would allow access to ensure that Aldridge had not been working for MDS when he should have been working for APCo. Aldridge again refused to sign the release. Webb warned Aldridge two more times that he would be discharged if he did not sign the release. Webb and Cagle offered to remove the language in the release that Aldridge found objectionable. Aldridge's union representative advised him to sign the release. Aldridge acknowledged that he knew he would be discharged if he did not sign the release, but he continued to refuse to do so. Webb then told Aldridge that he was being discharged for making misrepresentations, for failing to properly report his absences, and for failing to maintain proper attendance.
 II. Procedural History
On February 18, 1999, Aldridge sued APCo, asserting claims of retaliatory discharge, invasion of privacy, intentional infliction of emotional distress, and tortious interference with a business relationship. On July 20, 2000, APCo filed a motion for a summary judgment as to all of Aldridge's claims. On March 12, 2001, the trial court entered a summary judgment in favor of APCo as to all but Aldridge's retaliatory-discharge claim. APCo then filed an amended answer asserting that § 301 of the Labor Management Relations Act of 1947, codified at 29 U.S.C. § 185(a), preempted Aldridge's retaliatory-discharge claim. Aldridge filed a motion to strike APCo's amended answer. APCo also filed a motion for a summary judgment based on the alleged preemption. The trial court, determining that the claim was not preempted, struck APCo's amended answer. On September 10, 2001, a jury trial began on the retaliatory-discharge claim. At the close of Aldridge's case, APCo filed a motion for a JML. The trial court denied the motion, and APCo presented its case. At the conclusion of the evidence, APCo renewed its motion for a JML, which the trial court again denied. On September 20, 2001, the jury returned a verdict in favor of Aldridge in the amount of $500,000 — $250,000 in compensatory damages and $250,000 in punitive damages.
APCo filed a posttrial motion for a JML pursuant to Rule 50 and a motion for a new trial or a remittitur of the punitive-damages award pursuant to Rule 59, Ala.R.Civ.P., and filed briefs in support of its motions. Aldridge filed a response, and the trial court heard oral argument on APCo's motions. On December 31, 2001, the trial court entered an order denying all of APCo's posttrial motions. APCo appealed.
 III. Standard of Review
We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is "indistinguishable from the standard by which we review a summary judgment." Hathcock v. Wood, 815 So.2d 502, 506 (Ala. 2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination. City ofBirmingham v. Sutherland, 834 So.2d 755 (Ala. 2002). In FleetwoodEnters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala. 2000), this Court stated that "`[s]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"791 So.2d at 923 (quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989)).
The trial court denied APCo's motion for a JML at the close of Aldridge's *Page 561 
evidence and again at the conclusion of all of the evidence. It is unnecessary to review the record as it stood at the time APCo moved for a JML at the close of Aldridge's evidence because, even assuming the motion was erroneously denied at that time, we review the record as of the time the motion for a JML was renewed at the close of all the evidence. Although before the adoption of the Alabama Rules of Civil Procedure a defendant challenging the sufficiency of the evidence at the close of a plaintiff's case by a demurrer to the evidence waived his right to proceed, a defendant can move for judgment as a matter of law at the close of the plaintiff's case and, if the motion is denied, present evidence as a part of its defense. Rule 50, Committee Comments on 1973 Adoption. However, by electing to offer evidence, the defendant waives any error in the trial court's denial of the motion for a JML at the close of plaintiff's evidence. See Potti v. Duramed Pharmaceuticals, Inc.,938 F.2d 641 (6th Cir. 1991); Trustees of the University of Pennsylvaniav. Lexington Ins. Co., 815 F.2d 890 (3d Cir. 1987) (applying the comparable Rule 50, Fed.R.Civ.P.); 9A Charles Alan Wright Arthur R. Miller, Federal Practice and Procedure: Civil § 2534 n. 3 (2d ed. 1995).[2] We therefore review the record as of the close of all of the evidence.
 IV. The Prima Facie Case
APCo argues that the trial court applied an incorrect standard for determining when a plaintiff has established a prima facie case of retaliatory discharge. The trial court, quoting Dunn v. Comcast Corp.,781 So.2d 940, 943 (Ala. 2000), stated that a plaintiff could establish a prima facie case of retaliatory discharge by showing substantial evidence of "1) an employment relationship; 2) an on-the-job injury; 3) notice to the employer of an on-the-job injury; and 4) subsequent termination of employment." APCo asserts that the trial court's reliance on Dunn was misplaced and that the standard enumerated by the trial court would allow an employee to establish a prima facie case of retaliatory discharge merely by filing a workers' compensation claim and subsequently being discharged.
APCo contends that in this context to establish a prima facie case an employee must show that he was discharged "because" he filed a workers' compensation claim. APCo points us to this Court's decisions in Twilleyv. Daubert Coated Prods., Inc., 536 So.2d 1364 (Ala. 1988), and G.UB.MK.Constructors v. Carson, 812 So.2d 1175 (Ala. 2001). In Twilley, this Court held that "an employee may establish a prima facie case of retaliatory discharge by proving that he was `terminated' because he sought to recover workers' compensation benefits, which would be an impermissible reason." 536 So.2d at 1369. In G.UB.MK. Constructors, this Court stated that "`[i]n order to establish a prima facie case of retaliatory discharge the plaintiff must present substantial evidence that he was terminated solely for seeking workers' compensation benefits.'" 812 So.2d at 1177 (quoting Kent Corp. v. Hale, 699 So.2d 954,958 (Ala. 1997)). APCo also points to § 25-5-11.1, Ala. Code of 1975, which states that an employee cannot be discharged "solely because" he or she has brought a claim for workers' compensation benefits.
It is clear from the differing interpretations by the trial court and by APCo that we must clarify the proof necessary for *Page 562 
establishing a prima facie case of retaliatory discharge. Section 25-5-11.1
provides the basis for a claim of retaliatory discharge when one has been discharged in response to the filing of a claim for workers' compensation benefits. Section 25-5-11.1 states, in part: "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits. . . ." (Emphasis added.) In Bleier v. WellingtonSears Co., 757 So.2d 1163 (Ala. 2000), we held that whether an employee was "willing and able" to return to work was not part of a prima facie case of retaliatory discharge. In doing so we stated:
 "Against the bare-bones framework of § 25-5-11.1, creating a remedy for a retaliatory discharge, the courts of this state have been required to flesh out the elements of this relatively new cause of action. One of the fundamental rules of statutory construction is that a court is to determine and give effect to the Legislature's intent in enacting a statute. Norfolk S. Ry. Co. v. Johnson, 740 So.2d 392 (Ala. 1999). In construing acts of the Legislature, we ascertain its intent from the language used in the statute itself, if possible, as well as from the reason and necessity for the act and the goals the Legislature sought to accomplish. McGuire Oil Co. v. Mapco, Inc., 612 So.2d 417
(Ala. 1992); Advertiser Co. v. Hobbie, 474 So.2d 93
(Ala. 1985). If the statute is ambiguous, then we `may consider conditions that might arise under the provisions of the statute and examine results that would flow from giving the language in question one particular meaning rather than another.' Norfolk S. Ry. Co., 740 So.2d at 396. Section 25-5-11.1 prohibits an employee's discharge `solely because the employee has instituted or maintained [an] action' seeking workers' compensation benefits. In Twilley, 536 So.2d at 1364, this Court held that the term `solely,' as used in the retaliatory-discharge statute, was intended to give the statute remedial effect. Because the statute is remedial legislation, we must construe § 25-5-11.1 liberally in order to effectuate its beneficent purposes. Id.
 ". . . However, at the same time, we must refrain from construing § 25-5-11.1 in a manner that revises the at-will doctrine beyond the extent necessary to accommodate the obvious legislative purpose."
Bleier, 757 So.2d at 1168-69. Our inquiry today leads us to again construe § 25-5-11.1 liberally, yet we are cognizant that we must refrain from revising the at-will doctrine beyond the extent necessary to accommodate the legislative purpose.
The language of § 25-5-11.1 and our caselaw support a determination that the trial court here applied an incorrect standard in deciding whether Aldridge had established a prima facie case. It is true that inDunn we stated that a trial court determining whether to grant a defendant's motion for a summary judgment should "ask whether the employee has shown: (1) an employment relationship; (2) an on-the-job injury; (3) notice to the employer of the on-the-job injury; and (4) subsequent termination of employment." 781 So.2d at 943. However, the language in Dunn was meant to clarify that after Bleier, a showing that the employee was "willing and able" to return to work was not necessary to establish a prima facie case. See id. Implicit in our Dunn reasoning was the necessity for a causal link between the plaintiff's filing of a workers' compensation claim and his subsequent discharge. We stated that once an employee has established a prima facie case "[t]he burden would then shift to the employer to rebut the inference that the *Page 563 
discharge was retaliatory, by articulating a nonretaliatory reason for the discharge, supported by substantial evidence." 781 So.2d at 943. If the only showings required to establish a prima facie case were the four explicitly listed in Dunn and quoted by the trial court, there would be no "inference that the discharge was retaliatory" and no need for the burden of proof to shift from the employee to the employer.
A plaintiff must prove a causal connection between the workers' compensation claim and the subsequent discharge in order to establish a prima facie case. See, e.g., Twilley, 536 So.2d 1364; Hayden v. Bruno's,Inc., 588 So.2d 874, 876 (Ala. 1991) (affirming the trial court's summary judgment for Bruno's because the plaintiff "presented no evidence that Bruno's terminated him because he had filed a workmen's compensation claim" and refusing to "assume, that, because he was terminated after he filed th[e] claim, the termination was retaliatory"). This Court has determined that a plaintiff established a prima facie case of retaliatory discharge by proving: 1)that he filed a workers' compensation claim for a work-related injury, 2) "that the injury prevented him from working," and 3) "that when he returned to work he was informed that he no longer had a job." Graham v. Shoals Distrib., Inc., 630 So.2d 417, 418 (Ala. 1993); see also Rickard v. Shoals Distrib., Inc., 645 So.2d 1378 (Ala. 1994);Overton v. Amerex Corp., 642 So.2d 450 (Ala. 1994). This line of cases relies on this Court's determination in Culbreth v. Woodham PlumbingCo., 599 So.2d 1120 (Ala. 1992), that the plaintiff had established a prima facie case by establishing the aforementioned three facts. However,Culbreth referred to Twilley's standard requiring a determination that the plaintiff was discharged "because" of his workers' compensation claim. See Culbreth, 599 So.2d at 1122; Twilley, 536 So.2d at 1369. In finding that Culbreth had established a prima facie case of retaliatory discharge, this Court determined that Culbreth's discharge was causally connected to his workers' compensation claim because the evidence indicated that Culbreth had filed a workers' compensation claim, that he had missed work for approximately two weeks, and that he had been discharged upon his return to work. The temporal proximity in Culbreth, as well as in Graham, Rickard, and Overton, between the filing of the plaintiff's workers' compensation claim and the plaintiff's return to work and subsequent discharge established a causal connection. No such temporal proximity exists in this case; APCo discharged Aldridge approximately two years after he filed his workers' compensation claim.
Accordingly, we reiterate the elements requiring a causal connection between an employee's workers' compensation claim and the employee's discharge.[3] In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim. Any error on the part of the trial court in applying an improper standard at the time of APCo's motion for a JML at the close of Aldridge's case was waived when APCo went forward with evidence in support of its defenses. However, because *Page 564 
APCo renewed its motion for a JML at the close of all of the evidence and again after judgment was entered, we must review the entire record to determine whether the trial court erred in denying the motion for a JML.
 V. Evidence of a Causal Connection
Our caselaw has not addressed in detail the evidence a plaintiff must present to show that he was fired solely because of his workers' compensation claim. 6 Arthur Larson and Lex K. Larson, Larson's Workers'Compensation Law § 104.07[3] (2001), states: "Proximity in time between the claim and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations. Any evidence of an actual pattern of retaliatory conduct is, of course, very persuasive." We have also found several circumstances considered by other jurisdictions to indicate that a plaintiff has made a sufficient showing of a causal connection so as to establish a prima facie case.
However, the statutes in most states do not use the word "solely" in defining a cause of action for retaliatory discharge. Some states, such as Texas and South Carolina, use a "but for" test, which requires an employee to prove "that, but for the filing of the workers' compensation claim, the discharge would not have occurred when it did." Wal-MartStores, Inc. v. Amos, 79 S.W.3d 178, 184 (Tex.Ct.App. 2002); see alsoWallace v. Milliken Co., 305 S.C. 118, 121, 406 S.E.2d 358, 360
(1991). Other states require less, merely calling for a causal connection between the claim for workers' compensation benefits and the discharge. See, e.g., General Elec. Co. v. Gilbert, 76 Ark. App. 375, 381,65 S.W.3d 892, 897 (2002) (requiring "substantial evidence that the workers' compensation claim was a cause of the discharge") (emphasis added); Bracken v. Dixon Indus., Inc., 272 Kan. 1272, 38 P.3d 679
(2002); Anderson v. Meyer Broadcasting Co., 630 N.W.2d 46 (N.D. 2001);Nestor v. Bruce Hardwood Floors, L.P., 210 W. Va. 692, 694, 558 S.E.2d 691,694 (2001) ("filing of a workers' compensation claim was a significantfactor in the employer's decision to discharge the employee") (quotingPowell v. Wyoming Cablevision, Inc., 184 W. Va. 700, 403 S.E.2d 717, 721
(1991) (emphasis added)).
Our research reflects that three other states — Indiana, Maryland, and Missouri — use a formulation comparable to ours requiring the discharge to be considered retaliatory be "solely" because of a workers' compensation claim. See Frampton v. Central Indiana GasCo., 260 Ind. 249, 297 N.E.2d 425 (1973); Hansome v. NorthwesternCooperage Co., 679 S.W.2d 273 (Mo. 1984); Kern v. South Baltimore GeneralHosp., 66 Md. App. 441, 504 A.2d 1154 (1986). Indiana has determined that "`the word "solely" . . . [is] used to mean without an independent lawful reason which would justify the otherwise unlawful action.'" Dale v. J.G.Bowers, Inc., 709 N.E.2d 366, 369 (Ind.Ct.App. 1999) (quoting Watkins v.Sommer Metalcraft Corp., 844 F. Supp. 1321, 1326 (S.D.Ind. 1994)). Any concerns over the stringency of the standard of sole causation established by § 25-5-11.1 should properly be addressed to the Legislature.
Texas considers the following factors as circumstantial evidence of a causal relation between the filing of a workers' compensation claim and an employee's discharge:
 "1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly *Page 565 
situated employees, 5) sudden changes in an employee's work performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false."
Chhim v. University of Houston, 76 S.W.3d 210, 218 (Tex.Ct.App. 2002). Many states also consider "[p]roximity in time between the filing of the workers' compensation claim and discharge" a persuasive factor in establishing a causal connection. Rebarchek v. Farmers Coop. Elevator Mercantile Ass'n, 272 Kan. 546, 555, 35 P.3d 892, 899 (2001) (stating that proximity in time was "a typical beginning point. . . . [but] not the sole means of showing a causal connection").[4] See alsoAnderson, 630 N.W.2d 46; Nestor, 210 W. Va. 692, 558 S.E.2d 691.
Aldridge argues that he presented sufficient evidence to establish a prima facie case of retaliatory discharge. He first points to the memorandum sent by APCo's human resources department to its disability management section that revealed an intent to "closely monitor" Aldridge. Aldridge contends that this memorandum shows a plan on APCo's part "to critically scrutinize" Aldridge in an effort to "set him up for termination." Next, Aldridge points to six investigations of him he alleges were performed by APCo. He argues that those investigations resulted from his workers' compensation "claims."[5]
The first investigation was initiated by APCo management immediately after Aldridge filed his workers' compensation claim. The second investigation was initiated by Helen Nalley of the disability management section in February 1998 and included surveillance of Aldridge's activities by I.C.U. Investigations, a private investigation firm. Aldridge contends that I.C.U. initiated a new investigation of him on February 17, 1998. The fourth, fifth, and sixth investigations referred to by Aldridge consist of the investigation of Aldridge's February 17 absence from work performed by Ray and the investigation into Aldridge's February 9 and 17 absences performed by Cagle. The latter two investigations by Cagle include the cover pages designating the category of the investigations as "Claims" and the subcategory as "Workers' Compensation." Aldridge argues that these cover pages prove that Aldridge's workers' compensation claim was the cause of his investigation and his subsequent discharge.
Aldridge contends that APCo's human resources department, the disability management section, and Webb were sharing information and were working in concert to cause his discharge. Aldridge also points out that Webb discharged Aldridge despite the fact that Aldridge was no longer working under his supervision. Finally, Aldridge argues that he was treated differently than other APCo employees were treated; as an example he points out that his supervisor, Ray, had missed two weeks of work in the past but was not discharged.
APCo contends that there were three legitimate reasons for Aldridge's discharge. First, Aldridge made several misrepresentations about his absences on *Page 566 
February 9 and February 17. APCo contends that Aldridge, in his interview with Cagle, concealed the fact that he was also working for MDS on February 9. As to his February 17 absence, APCo argues that Aldridge misrepresented that he had to miss work to fix his roof, because no work was done on the roof that day. APCo's second reason for discharging Aldridge is that he failed to maintain regular attendance while he was employed as a meter reader. APCo points out that Aldridge missed 32 days of work between December 2, 1997, and February 17, 1998. APCo argues that the fact that Aldridge had doctor's excuses for most of those absences does not make this reason pretextual. APCo presented evidence indicating that it applied its attendance policy to Aldridge in the same manner it applied the policy to other employees.[6] The third reason for discharge presented by APCo for Aldridge's discharge is that he failed to properly report his absences. In addition to Aldridge's misrepresentations regarding his February 9 and 17 absences, APCo points to Aldridge's failure to report to work on time on January 21 and his failure to report to work at all on January 22.
Cases from jurisdictions providing a remedy for retaliatory discharge when an employee has suffered an on-the-job injury and has then filed a claim for workers' compensation benefits that do not require the employee to prove sole causation are illustrative of the circumstantial evidence sufficient to establish a prima facie case of causation — with one caveat. The issue of sole causation must properly be a question for the jury before these illustrations are applicable. Because in our disposition of this case we conclude that sole causation was not a question for the jury, see part VII, an embrace of these circumstances as determinative under § 25-5-11.1 would be dicta only. We therefore do not reach the question whether the circumstances surrounding Aldridge's discharge, some of which involve disputed fact questions, would establish a prima facie case of sole causation.
 VI. Judgment as a Matter of Law on Sole Causation
This Court applied a comparable statute affording a remedy for retaliatory discharge solely for having served on a jury in NorfolkSouthern Ry. v. Johnson, 740 So.2d 392 (Ala. 1999). Johnson, an employee of Norfolk Southern Railway, served as a juror on a case in which Norfolk Southern was the defendant. During voir dire, Johnson was asked if he had ever suffered an on-the-job injury. Johnson replied that he had not, although he actually had sustained four prior on-the-job injuries; for one of those he received a $2,500 settlement from Norfolk Southern and for another he received $8,000 in a class action. As a result of his voir dire answer, Norfolk Southern charged Johnson with conduct unbecoming an employee and ultimately discharged him from its employment. Johnson sued Norfolk Southern for retaliatory discharge. Norfolk Southern moved for a summary judgment, and the trial court denied the motion. Norfolk Southern appealed.
In reviewing the trial court's denial of Norfolk Southern's motion for summary judgment, we interpreted § 12-16-8.1, a statute analogous to § 25-5-11.1. Section 12-16-8.1 states that an employee may not be discharged "solely because he serves on any jury empanelled under any state or *Page 567 
federal statute." (Emphasis added.) We stated: "It seems obvious that the Legislature intended to prohibit an employer from discharging an employee solely because the employee was absent from work because he or she was called for jury duty." Norfolk Southern, 740 So.2d at 396. We then addressed whether Norfolk Southern discharged Johnson "solely" for serving on the jury or, as it contended, because he provided false answers during voir dire. In making this determination, we used the burden-shifting approach stated in Culbreth. Once the plaintiff has established a prima facie case, the burden shifts to the defendant to present legitimate reasons for the plaintiff's discharge; if the defendant presents legitimate reasons the burden would shift back to the plaintiff to prove that the stated reasons are pretextual. Culbreth,599 So.2d at 1122.
Johnson established his prima facie case by showing that his discharge occurred days after he served on the jury. Norfolk Southern countered with its legitimate reason of discharge, i.e., that Johnson had lied in his answers to voir dire questions. Johnson responded by pointing to three facts he claimed proved Norfolk Southern's stated reason for his discharge was pretextual. Upon review of those facts, this Court determined that a genuine issue of material fact existed with regard to the reason for Johnson's discharge and that the trial court correctly denied Norfolk Southern's motion for a summary judgment.740 So.2d at 398.
Norfolk Southern argued that because Johnson's voir dire answers had been deemed false by the Public Law Board to which Johnson had appealed his termination, "`no reasonable juror could conclude that [Johnson] was discharged solely for his jury service.'" 740 So.2d at 398. Norfolk Southern pointed to Oden v. Norfolk Southern Ry. (No. 96-P-111-S, N.D. Ala., Nov. 25, 1997) (not published in F. Supp.), which held in an analogous context that a summary judgment was proper because "Oden had proffered no `credible evidence' of a discriminatory intent by Norfolk Southern." 740 So.2d at 398. We distinguished Oden from Johnson on the basis that evidence existed in Johnson that supported Johnson's claim and that the Public Law Board's decision offered "no conclusive determination on the question whether Norfolk Southern's reasons were pretextual."740 So.2d at 399. In recognizing the existence of a jury question, we pointed to substantial evidence indicating that discharge was an excessive sanction and a violation of the collective-bargaining agreement.
Aldridge argues that substantial evidence was presented in this case to allow a jury to disbelieve APCo's proffered reasons and to believe that Aldridge was actually discharged because of his workers' compensation claim. Aldridge points to this Court's decision in Culbreth, which stated: "If the plaintiff's prima facie case is strong, and the defendant's evidence of an asserted reason is weak or equivocal, the jury might simply disbelieve the defendant." 599 So.2d at 1122. Relying on this statement, Aldridge contends that "[i]t is within the jury's province to accept or reject the power company's stated reasons as true or untrue." Aldridge's brief p. 53. This Court in Culbreth held:
 "The plaintiff does not have to `prove' that the employer's stated reason is not true unless the defendant's evidence is sufficiently certain, without more evidence from the plaintiff, to support a directed verdict. If the plaintiff's prima facie case is strong, and the defendant's evidence of an asserted reason is weak or equivocal, the jury might simply disbelieve the defendant." *Page 568 
599 So.2d at 1122 (first emphasis added). If the defendant's evidence relating to the reason for the discharge is "sufficiently certain" to support a directed verdict (now a JML), then the plaintiff must prove that the defendant's reason is not true. 599 So.2d at 1122.
The clear import of our holding in Norfolk Southern is that where a conclusive determination can be made that retaliation is not the sole
basis for the discharge a judgment as a matter of law is appropriate. A plaintiff, therefore, has the burden of presenting sufficient evidence indicating that the plaintiff was discharged because he or she filed a claim for workers' compensation benefits, but if there is uncontradicted evidence of an independently sufficient basis for the discharge then the defendant is entitled to a judgment as a matter of law. Such a holding is comparable to the rule prevailing in Indiana under a similar statute. SeeDale, 709 N.E.2d at 369 ("`the word "solely" . . . [is] used to mean without an independent lawful reason which would justify the otherwise unlawful action'"). An employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.
If such undisputed evidence is admitted as a part of the plaintiff's case, then the defendant who so moves is entitled to a judgment as a matter of law at that point. If such evidence is established during the defendant's presentation and the plaintiff cannot thereafter rebut it, then the defendant's renewed motion for a judgment as a matter of law at the close of all of the evidence is due to be granted. Whether the plaintiff's prima facie evidence is strong and the defendant's evidence is weak or equivocal and therefore subject to disbelief by a jury, as recognized in Culbreth, must be determined on a case-by-case basis.
 VII. Evidence of Sole Causation of Aldridge's Discharge
Turning to whether a conclusive determination can be made as to sole causation in this case, we must view the evidence in a light most favorable to Aldridge. See City of Birmingham v. Sutherland,834 So.2d at 758. After a defendant has presented legitimate reasons for discharge, "`[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendant's [stated] reasons'" for terminating the plaintiff are not true." Culbreth, 599 So. at 1122, quoting Twilley,536 So.2d at 1369, quoting in turn Pushkin v. Regents of the Universityof Colorado, 658 F.2d 1372, 1387 (10th Cir. 1981). As previously noted, we review the entire record, not merely the evidence as it stood at the time APCo first moved for a JML.
The facts surrounding Aldridge's representation of his need to make immediate repairs to his roof in order to have an excused absence from work constitute undisputed evidence of a misrepresentation. First, Aldridge agrees that the voice-mail message was accurately transcribed. As previously noted, Aldridge stated:
 "Jean, this is Kevin Aldridge. How about telling Robin [Ray] that that storm came through last night took some shingles off my roof. I've got to get it covered up before everything I've *Page 569 
got in my house ruins and I'll be in in the morning."
The clear import of Aldridge's message is that he needed an excused absence from work to make emergency repairs to his roof. At oral argument, Aldridge contended that a fair reading of the message was that Aldridge would use the day in an attempt to secure the services of an insurance adjuster, which Aldridge contends he spent the day trying unsuccessfully to do, rather than make repairs to the roof himself. No reference to such activity appears in the message. No reasonable basis exists for the premise that the adjuster could be expected to visit the house and make emergency repairs. No evidence suggests that without financial assistance from his insurance company, Aldridge could not afford to purchase a plastic cover to place temporarily over the damaged area. We reject Aldridge's contention as an unreasonable and unsupported construction of his unambiguous voice-mail message. Second, Aldridge conceded at oral argument that when a representative of APCo visited the property the next day, no repairs, either temporary or permanent, had been made to the roof. At oral argument, Aldridge suggested that once an excuse had been granted, it did not matter how Aldridge spent the day. Such a position is untenable.
APCo included misrepresentations as a stated basis for Aldridge's discharge. The evidence established without dispute the existence of a misrepresentation by Aldridge. Moreover, Aldridge offered no evidence indicating that termination of employment as a sanction for misrepresenting the reason for an absence from work was applied discriminatorily to employees who filed workers' compensation claims or indicating that such a misrepresentation should not justify a discharge based on either disparate treatment of similar infractions by other employees or indicating that termination otherwise conflicted with stated company policy on grounds for discharge. Nor did Aldridge show that APCo subsequently disavowed its reliance on Aldridge's misrepresentation as the basis for its decision to discharge him. This case is therefore readily distinguishable from Norfolk Southern, 740 So.2d at 398-99, where the discharge was considered to be an excessive sanction and a violation of the collective-bargaining agreement, factors that led us to affirm the trial court's order denying a summary judgment. The evidence of Aldridge's misrepresentation as to why he missed work on February 17 is neither "weak" nor "equivocal," and a jury would have no basis to "simply disbelieve" APCo. Culbreth, supra at 31.
That Aldridge's misconduct might not have been detected without close scrutiny is no basis upon which to shield him from the consequences of his own wrongdoing. The necessary element of discriminatory treatment in the context of claims alleging excessive monitoring is disparate treatment of wrongdoers, not merely getting caught doing wrong. Indeed, Aldridge does not dispute the fact that no repairs were made to his roof on the day of his absence. Thus, in order to survive APCo's motion for a judgment as a matter of law at the close of all of the evidence Aldridge would have to offer evidence indicating that he did not make misrepresentations regarding his absence on February 17.
APCo has presented undisputed evidence supporting one of its legitimate reasons for discharge — that Aldridge made misrepresentations concerning his absence on February 17 in order to make repairs to his roof. Consequently, Aldridge failed to present substantial evidence that APCo discharged him "solely because [he] has instituted or maintained any action against the employer to recover workers' compensation *Page 570 
benefits," § 25-5-11.1 (emphasis added). It is therefore unnecessary to address whether other aspects of Aldridge's proof would constitute a prima facie case of causation.
 VIII. Conclusion
We reverse the trial court's order denying APCo's motion for a JML at the close of the evidence and remand the case for the trial court to enter a judgment in favor of APCo as a matter of law. We pretermit consideration of other issues raised by APCo.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Houston, See, Brown, Harwood, Woodall, and Stuart, JJ., concur.
Johnstone, J., concurs in the rationale in part.
Moore, C.J., dissents.
[1] APCo counters Aldridge's assertion that he picked up a shift on February 9 by pointing to the testimony of Bruce Werbach, terminal manager of MDS's Calera terminal, that Aldridge was scheduled to work on February 9.
[2] Compare Ex parte G.G., 601 So.2d 890 (Ala. 1992), stating the rule in criminal cases that when a motion for a judgment of acquittal is denied at the conclusion of the State's evidence, an appellate court reviews the evidence as it stood at the time of the motion.
[3] In characterizing the impact of the majority opinion, the Chief Justice, in his dissent, overreacts to the plight of the employee. An employer should use caution in interpreting today's holding in the restrictive terms of the dissenting opinion.
[4] Temporal proximity alone has not always been deemed sufficient. SeeBrungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("However, . . . temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.").
[5] Aldridge used the word "claims" in his brief to this Court. However, there is no evidence indicating that a workers' compensation claim was filed with regard to his December 1997 knee injury or that such a claim is pending.
[6] Tom Killian of APCo's labor relations department testified: "In other cases of APCo, we have had employees with legitimate illnesses, medical issues who could not be at work. They were terminated, grieved, arbitrated, and the Company won the arbitration."