On Application for Rehearing
 

 THOMAS, Judge.
 

 The opinion of July 31, 2009, is withdrawn, and the following is substituted therefor.
 

 Ray Keith Wood was employed by Black Creek, Inc., in May 1999. Black Creek manufactured handguns until it ceased operations in 2001. Wood was a machinist; he would use different machines to cut blocks of steel, to shape the frames of the guns, and to shape the barrels, and he also assembled the handguns. During his employment with Black Creek, Wood said that his forearms were subject to repetitive stress from running the machines and lathes and that he suffered discomfort for several months before he pulled a muscle loose in his left arm in February 2000.
 

 Wood went to see Dr. William Stewart at Northeast Orthopedic and Sports Clinic on January 7, 2000; Wood was referred to Dr. Stewart by his primary-care physician, who Wood had been seeing for months for pain in his elbows and arms. At that time, Wood had not yet suffered an injury at work and had not yet made a workers’ compensation claim; his treatment was being paid for by his private health insurer, and he indicated on his patient questionnaire that his injury was not work related. When conservative measures prescribed by Dr. Stewart failed to give Wood any relief, Dr. Stewart recommended surgery for Wood’s left arm on February 14, 2000. On March 7, 2000, after being notified of Wood’s claim that his injury was, in fact, work related, Black Creek’s workers’ compensation insurance earlier requested Wood’s medical records to review in order to determine whether Wood’s injury was compensable and to determine whether the surgery should be authorized; this process took approximately five weeks, which Virginia Fail, the workers’ compensation coordinator at Northeast Orthopedic, testified was a typical amount of time for such a review. On April 18, 2000, the carrier authorized Wood’s surgery, which was performed by Dr. Stewart on May 5, 2000.
 

 On May 9, 2000, Black Creek’s human-resources manager, Melanie Tullís, contacted Dr. Stewart’s office and advised that Black Creek had a light-duty position available for Wood. According to Tullís and Fail, Tullis’s telephone call was simply to advise that, once Dr. Stewart felt it appropriate, Wood could be released to a light-duty position. Both women testified that Tullis’s purpose was not to attempt to coerce Dr. Stewart into releasing Wood to light duty.
 

 On June 7, 2000, Dr. Stewart’s office faxed a return-to-work slip to Black Creek indicating that Wood would be released to return to work on June 8, 2000. However, Dr. Stewart had not informed Wood that he could return to work on June 8, 2000. Instead, Dr. Stewart had told Wood he could not return to work until after his next appointment on June 19, 2000. When they discovered the discrepancy between the information that had been relayed to
 
 *159
 
 Wood and the information contained in the faxed return-to-work slip, Tullis contacted Dr. Stewart’s office and Wood went to Dr. Stewart’s office to clear up the discrepancy. On June 9, 2000, Dr. Stewart’s office faxed to Black Creek a second return-to-work slip, indicating that Wood was to return to work on June 12, 2000, that he was released to perform right-handed work only, and that he was to have his left arm in a brace.
 

 Wood returned to work on June 12, 2000, which was a Monday. His time card reflects that he did not work on June 13, 2000. During the June 12 work week, Wood had three physical-therapy appointments. Wood’s time card indicates that he had a physical-therapy appointment on June 12, 15, and 16. Wood appears to have worked his full shift on June 12, having arrived at approximately 6:30 a.m. and clocking out at 2:30 p.m. to attend his appointment. However, on both June 15 and 16, Wood left work at 2:00 p.m., before the end of his shift, to attend his appointments. According to Tullis, because company policy required employees to attempt to schedule their doctor’s and physical-therapy appointments either at the beginning of their shift, near the end of their shift, or after their shift, Tullis wrote up a disciplinary warning regarding Wood’s failure to follow this policy on June 16, 2000. The disciplinary warning also warned that Wood was required to notify either Tullis or his supervisor if he was required to leave early to attend a doctor’s or physical-therapy appointment. Wood was never presented -with this disciplinary warning.
 

 According to Wood, his light-duty position first consisted of sorting and sometimes bagging small “roll pins.” However, Wood said that he was soon required to lift and weigh large pieces of scrap metal that weighed 20 to 30 pounds. Wood said lifting the large pieces of metal repeatedly during the day caused his right arm to develop significant pain. Wood testified that he informed his supervisor, Dorothy Willingham, that his light-duty job was hurting his right arm.
 

 Willingham testified that Wood never complained about pain or discomfort to her during the week he worked under her supervision. Willingham explained that Wood was required to sort the small roll pins and that he was not given the task of sorting and weighing large pieces of scrap metal. Likewise, George Robertson, another supervisor in the plant, testified that Wood’s light-duty position did not involve lifting large pieces of scrap metal. Robertson recalled that Wood complained about having to be at work that week, but Robertson said that Wood never mentioned discomfort or pain to him.
 

 On June 19, 2000, Wood had a scheduled doctor’s appointment. At that appointment, Wood complained to Dr. Stewart that his light-duty job' was causing his right arm to hurt. Dr. Stewart gave Wood a written excuse for missing work on June 19, 2000, which contained a notation indicating that Black Creek should “ease up” the work to which Wood had been assigned; when Black Creek received this excuse is not clear from the record. Wood did not go to work after his appointment with Dr. Stewart. According to Tullis, Wood had telephoned to inform his supervisor that he had a doctor’s appointment that morning and had indicated he would telephone after the appointment to let a supervisor know if he would not be returning to work that day. Wood testified that he did not know that he was required to return to work or to notify Black Creek if he was not coming in after the appointment. Because he had not returned to work or telephoned, Tullis wrote up another disciplinary warning for Wood regarding this matter on June 19, 2000. Wood
 
 *160
 
 was never presented with this disciplinary warning.
 

 On June 20, 2000, Wood arrived at work shortly before 7:00 a.m. for his scheduled shift. According to Wood, he had had a hard time getting up that morning and he had required assistance from his wife to get dressed. He explained that both of his arms hurt. Wood went to the front office around 7:00 or 7:30 to discuss his need to see the doctor again. According to Wood, he spoke with Daryl Weaver, the president of the company, about his increased pain; Wood said that when he told Weaver that he needed to visit the doctor, Weaver told him to “do what you gotta do” and to tell Tullís. Weaver, however, testified that he did not recall having a conversation with Wood on June 20, 2000.
 

 Wood said that, after he spoke with Weaver, he then went to see Tullís, who had recently arrived at work; he approached Tullís as she was headed to the restroom. According to Wood, he asked Tullís if she had gotten some paperwork, to which she replied yes but then told him that she “did not have time to fool with him” at the moment. Wood waited on Tullís outside the restroom and, upon her reappearance, told her that he needed to speak with her, to which Tullís again responded that she did not have time. Wood said that, at some point, he informed Tullís that he was going to the doctor. Wood said that Tullis’s responses perturbed him and that he was agitated; he described himself as being “pissed.”
 

 Tullís testified that Wood had approached her on the morning of June 20, 2000, that he had asked her if she had received “his paperwork,” that she had told him yes, that he had told her he needed to speak with her, and that she had told him that she was “in the middle of something” and that she could not speak with him at that time. Tullís explained that she was engaged in an orientation for two new employees that morning and that she did not have the time to review Wood’s paperwork or to discuss it with him. Tul-lís said that Wood appeared angry and agitated when she left him in the hallway and that he was making some comments as she walked away. Tullís noted that the two disciplinary warnings in Wood’s file had not ever been presented to Wood, although she was aware of them that morning.
 

 Two other employees, Byron Pledger and DeLynn Minshew, overheard a comment Wood admits he made as he left the office area that morning. Both employees signed statements on June 20, 2000, indicating that they had overheard Wood say, as he left the office area: “She can just kiss my ass.” Both employees also testified at trial that they had overheard Wood make that statement. Minshew testified that she had heard a “commotion” and loud voices, prompting her to leave her desk to investigate, and that she heard the comment as Wood slammed the door between the front office and the shipping area. Wood admitted that he had made the statement, but he characterized it as being “to himself’ and as being “muttered under his breath.”
 

 After leaving the front office, Wood proceeded to the time clock and clocked out at 8:00 a.m. When he arrived at the time clock, Robertson was there. According to Robertson, Wood was agitated and seemed upset. Robertson said that he recalled that Wood stated: “ ‘If she doesn’t have time to see me’ ... he said he’s going to slap that bitch.” Robertson, like Minshew and Pledger, signed a statement regarding the incident on June 20, 2000; Robertson’s June 20 statement indicated that Wood had said “I’m leaving, I am going home before I slap that bitch, if that workmen comp, lady don’t have time to talk to me,
 
 *161
 
 I’m going to the house.” Robertson testified that Wood had not mentioned going to see the doctor but had said he was going home. At trial, Wood denied having said he would slap Tullís.
 

 At some point that morning, Tullís received information regarding Wood’s leaving work and the statements he had allegedly made. Tullís notified Tommy Marshall, the plant manager, that Wood had left work without permission. Marshall reviewed the statements given by Robertson, Minshew, Pledger, and Tullís regarding Wood’s comments that morning, and Marshall interviewed them as well. Marshall testified that he had also inquired of Willingham and Tullís whether Wood had received permission to leave. Willingham testified at trial that Wood had not asked her permission to leave; however, Wood said that she had given him permission to leave and had said that she was surprised that he had come in to work at all. Tullís also testified that she had not given Wood permission to leave and denied that Wood had ever mentioned a need to go to the doctor to her that day.
 

 After Marshall had satisfied himself that Wood had left work without permission and had made the comments that Min-shew, Pledger, and Robertson had recounted in their statements, Marshall decided to discharge Wood. According to Marshall, the company personnel handbook treated leaving work without permission as if the employee had voluntarily quit his or her employment. The handbook provision reads:
 

 “Leaving work (clocking out) prior to the end of the scheduled shift is considered leaving early. Leaving prior to the end of the scheduled work shift requires approval in all eases from the employee’s immediate supervisor. Leaving the company premises prior to the end of the scheduled shift without approval will be considered to have quit.”
 

 Marshall said he also considered the comments that other employees had overheard when making the decision to discharge Wood. Marshall said that the use of foul language at Black Creek was strongly discouraged. Although Marshall admitted that the occasional use of profanity around the manufacturing plant might be considered “shop talk,” he had not heard of employees using such language in the front office, where a more professional demeanor was expected. Weaver testified that the use of foul language around the plant was not acceptable and that this policy was well known throughout the plant. Minshew also testified that Weaver was adamant about the prohibition of foul language; she said that it was uncommon to hear such language at the plant.
 

 In addition, Marshall said that the fact that Wood’s use of profanity was directed toward a female managerial employee also figured into his decision. Finally, Marshall noted that Wood’s comment about slapping Tullís was, in his opinion, a threat directed at a managerial employee. The portion of the handbook applicable to Marshall’s decision to discharge Wood based on his alleged comments is the general section on disciplinary action:
 

 “Failure to observe established rules and practices can lead to disciplinary action including formal warnings, suspension, probation, and discharge. The following is a noninclusive list of misconduct that may lead to immediate adverse personnel action.
 

 [[Image here]]
 

 “8. Language or actions which are inappropriate to the workplace or which create a racially or sexually harassing environment.
 

 [[Image here]]
 

 
 *162
 
 “5. Threatening, assaulting, or abusing any employee, customer, or company visitor.
 

 [[Image here]]
 

 As noted above, Wood admitted making the comment that Tullís could “kiss my ass,” Wood testified that the handbook indicated that one could be discharged for the use of foul language. Although Min-shew and Pledger both testified that Wood had made the comment, Wood stated that no one had been around to hear his comment. Wood specifically testified that, in his opinion, his comment would have violated company policy only if he had said it directly to Tullís. Thus, Wood maintained that the fact that he had not made the comment directly to Tullís and had muttered it to himself instead should have bearing on whether the comment was considered significant enough for disciplinary action.
 

 Wood also said that he knew of other employees who had used foul language in the workplace but had not been disciplined; when questioned regarding names or incidents, Wood refused to provide further information. Weaver testified that he “guessed” that he knew of employees who were not discharged despite the use of foul language at the plant. However, he further explained, “I cannot honestly sit here and say I know of one other person that was terminated if it was totally for the foul language or not. I’m not sure. But it was part of it.”
 

 Tullís testified that Wood was considered to have voluntarily quit because he left work without permission. She further stated that, had he not quit, he would have been discharged as a result of his behavior on June 20, 2000. Tullís explained that, had Wood remained at work on June 20, 2000, he would have been called in to discuss the June 16 and June 19 warnings and his actions on June 20. Tullís noted that Black Creek did not have a progressive discipline policy. According to Tullís, Wood would have been discharged because of his actions on June 20 and not because of the earlier warnings.
 

 Marshall testified that he was the final decision-maker on all employment decisions. When asked if someone else had suggested to him that Wood be discharged, he said that he did not remember anyone doing so; he further explained that he had made his decision after being presented with the statements and interviewing the witnesses to Wood’s comments. Although he admitted that he knew about the two disciplinary warnings in Wood’s file that had not been presented to Wood, he said that the two things that influenced his decision to discharge Wood were the comments that he allegedly made and his walking off of the job without permission. Marshall testified that Wood’s workers’ compensation claim played no role in his decision to end Wood’s employment with Black Creek.
 

 To establish a prima facie case of retaliatory discharge, a discharged employee must establish that the employee and the employer had an employment relationship, that the employee suffered a work-related injury, that the employer knew that the employee had suffered a work-related injury, and that the employee was subsequently discharged based solely on his or her filing of a workers’ compensation claim arising from the work-related injury.
 
 Massey v. Krispy Kreme Doughnut Carp.,
 
 917 So.2d 833, 836-37 (Ala.Civ. App.2005) (quoting
 
 Alabama Power Co. v. Aldridge,
 
 854 So.2d 554, 563 (Ala.2002)). Because direct evidence demonstrating that an employer has discharged an employee solely because the employee filed a workers’ compensation claim is not often easily obtained, an employee may establish that the actual reason for the discharge
 
 *163
 
 was his or her filing of a workers’ compensation claim by circumstantial evidence.
 
 Alabama Power Co. v. Aldridge,
 
 854 So.2d at 564-65. In
 
 Aldridge,
 
 our supreme court discussed seven factors that can be circumstantial evidence of the necessary causal relationship between the employee’s workers’ compensation claim and that employee’s discharge.
 
 Aldridge,
 
 854 So.2d at 564-65. In addition to proximity of time between the filing of a claim and the discharge,
 
 id.
 
 at 564, the
 
 Aldridge
 
 court adopted the following six factors:
 

 “ ‘1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee’s injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee’s work performance evaluations following a workers’ compensation claim, and 6) evidence that the stated reason for the discharge was false.’ ”
 

 Id.
 
 at 564-65 (quoting
 
 Chhim v. University of Houston,
 
 76 S.W.3d 210, 218 (Tex.Ct. App.2002)).
 

 Once a discharged employee has demonstrated a prima facie case of retaliatory discharge, the burden shifts to the employer to establish a legitimate reason for the employee’s discharge.
 
 Ford v. Carylon Corp.,
 
 937 So.2d 491, 501 (Ala.2006). Once the employer has advanced a legitimate reason for the discharge, the burden again shifts to the discharged employee, who must present evidence demonstrating that the legitimate reason advanced by the employer is a mere pretext.
 
 Flint Constr. Co. v. Hall,
 
 904 So.2d 236, 250 (Ala.2004). If the employer is able to establish a legitimate reason and that reason is uncontra-dicted, the employer is entitled to a judgment as a matter of law (“JML”) in its favor.
 
 Aldridge,
 
 854 So.2d at 568.
 

 “An employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.”
 

 Id.
 

 In August 2000, Wood sued Black Creek, seeking workers’ compensation benefits and alleging that he had been discharged in retaliation for filing a workers’ compensation claim. The two claims were severed, and the workers’ compensation claim was eventually settled. After a trial on the retaliatory-discharge claim in December 2007, the trial court entered a judgment in favor of Wood and awarded him $50,000 in damages. After entertaining several postjudgment motions, the trial court entered an amended judgment stating that Wood had proven a prima facie case of retaliatory discharge and that the stated reason for his discharge was pretex-tual and stating that Wood was awarded $20,000 in back wages and $30,000 for mental anguish. Black Creek appealed to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).
 

 As in
 
 Aldridge,
 
 Black Creek moved for a JML at both the close of Wood’s evidence and at the close of all the evidence. Thus, we consider all the evidence in determining whether the trial court erred in denying the motion for a JML.
 
 Aldridge,
 
 854 So.2d at 564.
 

 
 *164
 
 “We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is ‘indistinguishable from the standard by which we review a summary judgment.’
 
 Hathcock v. Wood,
 
 815 So.2d 502, 506 (Ala. 2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination.
 
 City of Birmingham v. Sutherland,
 
 834 So.2d 755 (Ala.2002). In
 
 Fleetwood Enters., Inc. v. Hutcheson,
 
 791 So.2d 920, 923 (Ala.2000), this Court stated that
 
 [1]
 
 “[sjubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ 791 So.2d at 923 (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989))
 

 Aldridge,
 
 854 So.2d at 560.
 

 Black Creek makes several arguments on appeal. Chiefly, however, it argues that the evidence presented regarding its legitimate basis for discharging Wood entitled it to a JML under the standard enunciated in
 
 Aldridge.
 
 As noted above,
 

 “[a]n employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.”
 

 Aldridge,
 
 854 So.2d at 568. Black Creek argues that all of these requirements are met in the present case.
 

 Black Creek points out that, even though Wood’s alleged statement regarding slapping Tullís and his allegedly leaving work without permission were sharply disputed below, one other part of Wood’s behavior on June 20, 2000, which also formed part of the basis for Wood’s discharge, was undisputed. Specifically, Black Creek relies on Wood’s admission that he made the statement “she can just kiss my ass” in reference to Tullís after she was unable to speak with him on June 20, 2000. Although Wood argued that the fact that he “mumbled” the comment and did not make it directly to Tullís somehow ameliorated it, Wood admitted that, under the company handbook, the use of foul language was grounds for disciplinary action up to and including discharge. Thus, Black Creek is correct that one set of facts surrounding the stated basis for the discharge is undisputed. Wood’s comment that Tullís could just “kiss my ass” could have formed the basis for the discharge, because Marshall testified that both the allegation that Wood had left work without permission and his use of foul and inappropriate language in reference to Tullís that morning were equally considered in his decision to discharge Wood.
 

 Black Creek argues secondly that Wood presented no evidence indicating that the stated basis for discharge — the use of inappropriate and foul language in reference to a supervisory or managerial employee in the workplace — had been applied in a discriminatory manner to employees who had made workers’ compensation claims against it. Wood did testify that he had heard foul language in the workplace, and he said that he knew of other employees who had used foul language without suffer
 
 *165
 
 ing discipline.
 
 [1]
 
 However, Wood refused to give the names of those employees or to testify about the substance of the alleged incidents. We cannot conclude that Wood’s statement that “other employees did it” is substantial evidence indicating that Black Creek applied its policies in a discriminatory manner, especially in light of the testimony of other witnesses, including Weaver, Minshew, and Robertson, indicating that such language was not acceptable at Black Creek and that the use of such language was uncommon.
 

 Black Creek also argues that the stated basis of Wood’s discharge — his use of inappropriate and foul language in reference to a supervisory or managerial employee— does not conflict with its company policy. The handbook indicated that the use of inappropriate language can be basis for disciplinary action, up to and including discharge. Nothing in the handbook indicates that Black Creek had a progressive discipline policy; in fact, Tullís specifically testified that the company had no such policy. Wood presented no evidence to the contrary.
 

 Finally, Black Creek argues that it never disavowed the stated reason for Wood’s discharge. Wood, however, points to Tullis’s insistence that he voluntarily quit his employment and that he was not discharged because of his use of foul language. Notably, the record contains several indications that Marshall and not Tullís was the final decision-maker regarding Wood’s employment status. Although Tullís discussed with Marshall the fact that Wood left work without permission and although she indicated on Wood’s time card that he voluntarily quit, Marshall indicated that both Wood’s leaving work without permission and his use of foul language on June 20, 2000, equally formed the basis for his decision to discharge Wood on that day. Tullís further testified that, had Wood not been considered to have voluntarily quit, a fact she believed prevented the need to discharge Wood, he would have been discharged because of his conduct and use of foul language on June 20, 2000. A careful review of this testimony reveals no disavowal of the reasons for Wood’s discharge but a determination that both Wood’s actions in leaving work without permission and his use of foul and inappropriate language in reference to Tullís were bases considered by both Tullís and the ultimate decision-maker, Marshall, when the decision was being made.
 
 See Blue Circle Cement, Inc. v. Phillips,
 
 989 So.2d 1025, 1037-38 (Ala.2007) (discussing testimony that a discharged employee had “quit” or “self-terminated” his employment and determining that, based on a view of all the evidence, the decision-makers, in using those terms, had not disavowed the stated basis for discharge).
 

 We conclude that Black Creek has presented undisputed evidence of a legitimate reason for Wood’s discharge — that he used foul and inappropriate language in reference to a supervisory or managerial employee. Because Black Creek’s advanced reason is legitimate, Wood failed to present substantial evidence indicating that he was discharged solely for filing a workers’ compensation claim, as he was required to do to recover under Ala.Code 1975, § 25-5-11.1. We therefore reverse the trial court’s denial of Black Creek’s motion for a JML at the close of all the evidence, and
 
 *166
 
 we remand this case for the trial court to enter a JML in favor of Black Creek. Because of our reversal of the trial court’s denial of Black Creek’s motion for a JML, we pretermit discussion of the remaining issues raised on appeal by Black Creek.
 
 See Favorite Market Store v. Waldrop,
 
 924 So.2d 719, 723 (Ala.Civ.App.2005) (stating that this court would pretermit discussion of further issues in light of the dispositive nature of another issue).
 

 APPLICATION OVERRULED; OPINION OF JULY 31, 2009, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 PITTMAN, J., concurs.
 

 THOMPSON, P.J., concurs in the result, without writing.
 

 BRYAN and MOORE, JJ., dissent, without writings.
 

 [1]
 

 . Weaver and Marshall both admitted that some use of foul language likely occurred in the shop portion of the plant. However, neither man testified that such language had been directed at or in reference to a supervisory or managerial employee, a fact that Marshall said he had relied upon in determining that Wood’s use of foul language merited a discharge.