PITTMAN, Judge.
M & J Materials, Inc. (“the employer”), appeals from the denial of its disposi-tive motions filed in an action in which a judgment entered on a jury verdict was rendered by the Jefferson Circuit Court in favor of Stanford D. Isbell (“the employee”) on his claim asserted under Ala.Code 1975, § 25-5-11.1, which provides, in pertinent part, that “[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained an action against the employer to recover workers’ compensation benefits.” Because we agree with the employer that the employee failed to rebut the employer’s showing that its termination of the employee’s employment was based, in whole or in part, upon the employee’s reported open possession of a firearm on the employer’s *2 premises, we reverse the trial court’s judgment and remand the cause for the entry of a judgment in favor of the employer.
In February 2007, the employee brought an action against the employer and various fictitiously named defendants in the trial court seeking an award of benefits under the Alabama Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq. (“the Act”), based upon an alleged workplace wrist injury incurred on June 15, 2006. The employee further sought an award of compensatory damages for “mental anguish [and] lost wages” and “punitive damages” because, he. said, he made a claim for workers’ compensation benefits against the employer and his employment was thereafter terminated in violation of § 25-5-11.1. The employer filed an answer that denied liability and, as to the retaliatory-discharge claim, specifically averred that the employee’s employment had been terminated “for possession of and wielding a firearm within the workplace and property of’ the employer. The employee and the employer thereafter settled their differences as to the claim for disability benefits under the Act, leaving pending only the retaliatory-discharge claim. The employer filed a motion for a summary judgment as to the retaliatory-discharge claim, which motion the employee opposed; that motion was denied.
A trial was held on the retaliatory-discharge claim beginning on November 17, 2008, The employer’s motions for a judgment as a matter of law (“JML”) at the close of the employee’s evidence and at the close of all the evidence were denied. The trial court then instructed the jury on the applicable law, specifically noting, in pertinent part, that for the employee “to be entitled to recover punitive damages, you first must award compensatory damages[ ] or nominal damages.” The jury completed a round of deliberations and reached a verdict that purported to find in favor of the employee and to award $0 in compensatory damages and $75,000 in punitive damages. After the trial court and the employer’s counsel noted that the verdict was inconsistent, but before the jury was discharged, the trial court recalled the jury; reminded them that “[f|or a plaintiff to be entitled to recover punitive damages, you must first award compensatory damages or nominal damages”; and asked the jury to state “clearly what [its] intentions [we]re.” The trial court stated that “[i]f your intentions are to give no compensatory damages, you cannot give punitive damages,” but. added that “[i]f your intention is somehow to give punitive damages, the law supports punitive damages as long as there’s some reasonable finding or nominal finding of compensatory damages.” The jury then again deliberated and ultimately returned a verdict awarding $5,000 in compensatory damages and $70,000 in punitive damages; the trial court entered a judgment on that verdict on November 19, 2008, over the employer’s objection.
The employer filed a renewed motion for a JML on December 19, 2008, that (as supplemented) asserted that the employer was not liable to the employee as a matter of law; that the trial court had erred in rejecting the jury’s first verdict, reinstructing the jury regarding the nature of a proper damages award, and accepting the second verdict; and in failing to deem the punitive-damages award excessive under principles enunciated by the Alabama Supreme Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). The trial court entered an order on March 11, 2009, rejecting each of the grounds for relief recited in the employer’s renewed motion for a JML. Because the trial court had thereby adjudicated all claims against all parties, resulting in a final judgment *3 from which an appeal will lie, the employer properly and timely appealed, raising the same three issues that it had in its renewed motion for a JML. The Alabama Supreme Court transferred the appeal- to this court pursuant to Ala.Code 1975, § 12-2-7(6).
• In analyzing the three issues raised by the employer, we note that the first— whether the employee met his burden of proof as to his retaliatory-discharge claim so as to warrant denial of the employer’s motions for a JML — is of primary importance: if the trial court erroneously submitted the issues of the employer’s liability and the employee’s damages to the trier of fact, that error would warrant reversal of the judgment on the jury verdict and the direction to enter a judgment in favor of the employer on the retaliatory-discharge claim, thereby finally concluding the case. In contrast, the employer concedes in its appellate brief that its contentions regarding error in the trial court’s reinstructing the jury and accepting the jury’s second verdict would warrant the lesser relief of a new trial, after which the employer might again be held subject to liability, and that a determination that the punitive-damages award was excessive would, in the employer’s view, warrant only a remittitur of the excess damages.
The applicable standard of review as to the employer’s challenge to the trial court’s denial of its motions for a JML (more specifically, the employer’s motion for a JML at the close of all the evidence) was summarized by the Alabama Supreme Court:
“We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is ‘indistinguishable from the standard by which we review a summary judgment.’ Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002). In Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala.2000), this Court stated that ‘ “[sjubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ 791 So.2d at 923 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).”
Alabama Power Co. v. Aldridge, 854 So.2d 554, 560 (Ala.2002). Aldridge further summarized a number of substantive and procedural principles governing the propriety of a JML on a claim brought under § 25-5-11.1:
“In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee’s on-the-job injury and the filing of a workers’ compensation claim....
[[Image here]]
“... [W]here a conclusive determination can be made that retaliation is not the sole basis for the discharge a judgment as a matter of law is appropriate. A plaintiff, therefore, has the burden' of presenting sufficient evidence indicating that the plaintiff was discharged because he or she filed a claim for workers’ compensation benefits, but if there is uncontradicted evidence of an independently sufficient basis for the discharge then the defendant is entitled to a judgment as a matter of law. ... An ém- *4 ployer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.
“If such undisputed evidence is admitted as a part of the plaintiffs case, then the defendant who so moves is entitled to a judgment as a matter of law at that point. If such evidence is established during the defendant’s presentation and the plaintiff cannot thereafter rebut it, then the defendant’s renewed motion for a judgment as a matter of law at the close of all of the evidence is due to be granted.”
854 So.2d at 563-68 (first and third emphasis added).
The record reveals that the employee suffered an employment-related injury to his right wrist on June 15, 2006, and that an employer’s first-report-of-injury form was completed by Larry Cox, the employer’s vice president of manufacturing at the time, and transmitted to the Alabama Department of Industrial Relations. Although the employee returned to work in sheltered employment for several weeks, the employee was subsequently diagnosed with carpal tunnel syndrome and underwent carpal tunnel release surgery on July 25, 2006; he was determined to be at maximum medical improvement on November 9, 2006.
The record also reveals that at some time during 2006 while the employee was working for the employer, either before or after the employee’s injury, the employee brought a firearm onto the employer’s premises. The circumstances of the employee’s having done so are largely in dispute. The employee testified that on the day in question, which he identified as April 10, 2006 (but that the employer’s evidence identified as having been in late June), he had taken his .22 caliber target pistol inside the employer’s physical plant and had placed it inside a padlocked tool box because, he said, his automobile locks were not properly functioning and he “was afraid somebody would steal it” from that vehicle. The employee also testified that, when he had informed his supervisor, Steven Collins, that hé had brought the gun into the plant, Collins had stated that the employee “didn’t need that in here” and had directed him to return the weapon to the employee’s vehicle. The employee denied having engaged in horseplay with the firearm or having threatened anyone with it, contradicting other witnesses’ testimony that he had aimed the weapon at Collins several times; further, he denied having received a printed employee handbook or having seen a posted work rule barring firearms, and he added that knew of two or three other employees who had brought firearms into the employer’s plant and that one such firearm had been discharged, but that no one’s employment had been terminated as a result of that conduct.
Other evidence adduced by the employee tended to corroborate the employee’s testimony that other employees had brought firearms into the plant on various occasions. John Dooley, a former coworker of the employee, testified that he had seen four employees of the employer bring firearms into the plant. Shane Bowen, another former coworker of the employee, testified that he had observed that a number of employees had brought firearms with them to the employer’s premises for *5 selling or trading purposes, stating that it had been “common practice to buy and trade and sell guns” because he had worked “with a bunch of hunters,” but he added that that activity had occurred “in the parking lot 90 percent of the time.” Nonetheless, Bowen also testified that on one occasion he had shown some of his coworkers, including Collins, a firearm in its original display case “inside the plant” and had not been disciplined.[1] Although Bowen testified at his deposition that the employer had indeed had a firearms policy and that it was to the effect that “[y]ou don’t bring one in the plant,” on direct examination at trial Bowen testified that he had not seen or heard of a policy to the effect that “if you bring a pistol inside the plant you’re going to get fired”; on cross-examination, when confronted with the inconsistency, Bowen admitted that he “thought we got a handbook when we first came to work there.” Importantly, Bowen also testified that Cox, the employer’s vice president, had known nothing about the presence of any firearms at the plant.
The employee also called Greg Burns, another former coworker, as a witness. Burns testified that on one occasion he had observed the employee take a black pistol from a holster and aim it at Collins two or three times while Collins had his back turned to the employee. At that time, Burns, fearing the consequences of a heated confrontation between the employee and Collins that might result from a report that the employee had waved a gun at his supervisor, orally reported to Collins simply that the employee had brought a firearm to the plant and that that made him uncomfortable, after which Collins talked to the employee. Several weeks after having made that oral report, Burns, during a meeting with Cox, raised the firearm-possession issue again because, he erroneously believed, Cox had known about it, and he disclosed the alleged aiming incident in further detail at that time; Burns, Cox, and Collins then attempted to deduce the date of the occurrence from the length of the work day and the presence and absence of other workers, reaching the conclusion that the employee must have brought the firearm to work in late June 2006.
Another of the employee’s former coworkers, Randy Cohron, testified that he had observed the employee on the day when he brought the firearm into the employer’s plant, although he was unsure of the specific day on which that had occurred; he also did not observe the employee aim the weapon at anyone. Cohron testified that when he observed the employee with the weapon, he told the employee that he could “get in trouble for bringing it in,” ie., that the employee could “[g]et wrote up or fired.” Cohron also testified to knowing of one incident in which a former employee, identified only by the nickname “Convict,” had been fired after bringing a knife into the employer’s breakroom during a disagreement with a coworker. Cohron testified on direct examination that on one occasion he had himself purchased a weapon on the employer’s property, but he added during cross-examination that that transaction had occurred in the parking lot of the plant.
Collins testified at trial that Burns had approached him on a Saturday, close to the end of the working day, and had informed him that the employee “had a gun in the shop,” but had not reported that the employee had pointed the firearm at him. At that time, Collins simply instructed the employee to take the firearm out of the plant, but he added that “that was before I *6 found out he was pointing it at people.” Collins also testified that he had not made the decision to terminate the employment of the employee; he assumed that that decision was made by Cox.
Dooley testified that after it had been determined that the employee would be undergoing carpal tunnel release surgery, he had had a conversation with Collins about the employee’s situation and, according to Dooley, “he wasn’t liking it.” According to Dooley, Collins made the statement “I’m going to find some way to get this out of here” two or three weeks before the employee’s employment was terminated. Dooley also testified that Collins had subsequently informed him that the employee had been fired and that “[t]he lawyer said we could” terminate the employee’s employment for “[b]ringing a gun in here.” Dooley admitted, however, that he had been hired by Cox (not Collins) and that he had notified Cox (not Collins) when he decided to cease working for the employer.
Cox testified at trial that on July 27, 2006, Burns had first reported that he did not feel safe working in an environment with the employee present because, Burns had said, he had seen the employee take a pistol, point it at Collins, and pretend to shoot him. Cox also testified that he had prior knowledge that the employee did not like Collins. In response to Burns’s report, Cox summoned Collins, who reported that he had been unaware of the employee’s actions because they had occurred while Collins’s back had been turned to the employee. Cox immediately notified his own supervisor, Lavon Drake (the employer’s president in charge of operations), regarding the incident.
During the employer’s case, Frank Hop-son, the employer’s chief executive officer and part owner, testified that he had been contacted by Drake, who mentioned having a problem that normally would not be referred to Hopson but for “extenuating circumstances.” Hopson testified that after being informed that several coworkers of the employee had made statements to the effect that the employee had had a firearm in the plant and had pointed it at supervisory personnel, Hopson had indicated his agreement that the employee needed to be terminated from his employment; it was at that time, Hopson stated, that Drake told him of the employee’s workplace injury. Hopson did not alter his decision in response to that information; instead, he said, he acted in furtherance of “the safety of [his] employees” because he “had no earthly ... way to know the mental state” of the employee “or exactly what went on.” Hopson directed Drake to have Cox prepare a report of the incident and made plans to discuss the matter with a Truss-ville police officer Hopson knew.
Cox then prepared a memorandum containing accounts regarding the employee’s having brought a firearm into the plant that were provided by Burns, Cohron, and J.C. Pendleton (who later suffered a stroke and was not available to testify at trial); that memorandum, which is dated August 3,'2006, contains the signatures of all four men. Cox testified that his purpose in doing so was to “convey the information as best I could as to what I was being told so that my boss would be aware of what was happening and the severity of the incident.”
After a family vacation, Hopson returned to work and discussed the matter with the police officer, after which, Hopson testified, he made the decision to terminate the employee’s employment. In contrast, Cox testified that he had made a recommendation that the employee’s employment be terminated, and he stated that he, Drake, and Hopson had collectively made the decision to terminate the em *7 ployee’s employment. The employee was then notified, by a letter dated September 18, 2006, that his employment was being terminated “[a]fter careful review of an incident that involved you taking a weapon out of your car in the shop.”
We agree with the employee’s position, stated in his brief, that he made a prima facie showing the first three elements of a prima facie wrongful-discharge cause of action. However, we do not agree that the record reflects substantial evidence demonstrating that his employment was terminated solely because of his having made a workers’ compensation claim against the employer. As the Alabama Supreme Court indicated in Aldridge, our state’s pertinent statute, Ala.Code 1975, § 25-5-11.1, like that of three other states, “use[s] a formulation ... requiring the discharge to be considered retaliatory be ‘solely’ because of a workers’ compensation claim.” 854 So.2d at 564. According to Aldridge, the legislature’s choice of the word “solely” to establish the pertinent causation standard indicates an intent to limit the cause of action to situations in which the employer is “ ‘ “without an independent lawful reason which would justify the otherwise unlawful action.” ’ ” Id. (quoting Dale v. J.G. Bowers, Inc., 709 N.E.2d 366, 369 (Ind.Ct.App.1999), quoting in turn Watkins v. Sommer Metalcraft Corp., 844 F.Supp. 1321, 1326 (S.D.Ind.1994)). Here, while there was a dispute as to whether the employee, in fact, aimed a firearm at his supervisor on multiple occasions in the manner that Burns testified, there is no dispute that Burns reported to Cox (and then to Hopson) that the employee had engaged in such behavior, nor is there any dispute that the employee did bring a firearm into the employer’s plant.
Further, although the employee denied having had knowledge (before Collins told him to return the firearm to his motor vehicle) that possession of a firearm in the plant was contrary to a policy of the employer — a policy that was identified by a number of other witnesses as being in force — the record does not reflect that the employer has any history of applying a rule barring the taking of weapons into its plant in a discriminatory manner, i.e., only to those employees who seek workers’ compensation benefits, nor that the employer has any policy barring discharge of employees who bring weapons into its plant. Indeed, both Cox and Cohron testified that a temporary employee identified as “Convict” had been fired for having brought a knife from his vehicle into one of the employer’s structures. Further, although there was evidence indicating that a number of employees, including certain employees with supervisory duties, had brought firearms into the employer’s parking lot for trade, and even disputed evidence tending to show that such firearms had occasionally been brought into the plant, there is no evidence indicating that Cox and Hopson, the persons who the record indicates were in positions of authority as to personnel matters for the employer, were aware of any such instances. Finally, there is no evidence tending to show that the employer’s personnel with responsibility for hiring and firing have acknowledged that their stated reason for terminating the employee’s employment was in any way pretextual.
As a matter of federal law, entities such ás the employer have a duty to “furnish to each ... employee[ ] ... a place of employment ... free from recognized hazards that are causing or are likely to cause death or serious physical harm.” 29 U.S.C. § 654(a)(1). We recognize that the great majority of this country’s citizens are responsible stewards of their constitutional rights to keep firearms. See U.S. Const., amend. II; Ala. Const, of 1901, § 26. *8 That said, the potential for “death or serious physical harm” from a firearm in a workplace environment should that firearm conceivably come into the possession of a person who might be unable or unwilling to act responsibly,[2] and the prospect that the employer might suffer legal action in such circumstances, are valid legal concerns that may be considered by an employer confronting an employee who brings a firearm into the workplace. See Hansen v. America Online, Inc., 96 P.3d 950 (Utah 2004) (termination of employment of workers who brought firearms onto property of employer held not contrary to public policy).[3]
Based upon the foregoing facts and authorities, we conclude that the evidence presented at trial shows that the employee _ was not discharged solely on the basis that he had sought benefits under the Act for his workplace injury; in particular, the employee failed to show that the employer’s personnel with termination authority applied any policy against the possession of weapons in the workplace in a discriminatory manner only to employees who have filed workers’ compensation claims, acted outside company policy, or disavowed the reason given for the employee’s discharge. For that reason, we must conclude that, under Aldridge, the trial court erred in denying the employer’s motion for a JML filed after the close of all the evidence. Based upon those conclusions, we reverse the judgment entered on the jury verdict in favor of the employee without considering the employer’s other challenges to the judgment under review, and we remand the cause for the entry of a judgment in favor of the employer as a matter of law.
REVERSED AND REMANDED.
THOMPSON, P.J., and THOMAS and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.

. Collins later testified that that viewing actually had taken place in the parking lot.

. We need only cite Beard v. Mobile Press Register, 908 So.2d 932 (Ala.Civ.App.2004), as an example of what unfortunate circumstances can possibly occur when an irresponsible person brings a firearm into the workplace and of how likely efforts will be to hold the employer liable.

. We note that the Alabama Legislature has recently considered legislation that would bar employers from adopting policies preventing employees from keeping firearms in locked motor vehicles. See S.B. 360, 2010 Regular Session. However, the facts of this case, in which a firearm was taken out of a vehicle and brought into the workplace itself, would appear not to fall within the scope of such legislation.