MURDOCK, Justice,
We granted a petition for a writ of cer-tiorari filed by Stanford D. Isbell challenging the reversal by the Court of Civil Appeals of a judgment entered on a jury verdict in Isbell’s favor against Isbell’s former employer, M & J Materials, Inc. (“M & J”), on a claim alleging retaliatory discharge. We reverse the judgment of *11 the Court of Civil Appeals and remand the case.

I. Facts and Procedural History

In February 2007, Isbell sued M. & J and fictitiously named defendants in the Jefferson Circuit Court seeking an award of benefits under the Alabama Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq. (“the Act”), based upon a workplace injury to his wrist that occurred on June 15, 2006. Isbell further sought compensatory damages and punitive damages based on a claim of retaliatory discharge. In its answer to the complaint, M & J denied liability and, as to the retaliatory-discharge claim, specifically averred that Isbell’s employment had been terminated “for possession of and wielding a firearm within the workplace and property of’ M & J. The parties thereafter settled their differences as to the claim for disability benefits under the Act, leaving pending only the retaliatory-discharge claim. M & J filed a motion for a summary judgment as to the retaliatory-discharge claim, which Isbell opposed; that motion was denied.
A trial was held on the retaliatory-discharge claim beginning on November 17, 2008. The Court of Civil Appeals’ opinion provided a rendition of most of the facts adduced at trial, which we quote below. We have interspersed footnotes where appropriate to detail certain facts contained in the record but not mentioned by the Court of Civil Appeals.
“The record reveals that [Isbell] suffered an employment-related injury to his right wrist on June 15, 2006, and that an employer’s first-report-of-injury form was completed by Larry Cox, [M & J’s] vice president of manufacturing at the time, and transmitted to the Alabama Department of Industrial Relations. Although [Isbell] returned to work in sheltered employment for several weeks, [Isbell] was subsequently diagnosed with carpal tunnel syndrome and underwent carpal tunnel release surgery on July 25, 2006; he was determined to be at maximum medical improvement on November 9,2006.
“The record also reveals that at some time during 2006 while [Isbell] was working for [M & J], either before or after [his] injury, [Isbell] brought a firearm onto [M & J’s] premises. The circumstances of [Isbell’s] having done so are largely in dispute. [Isbell] testified that on the day in question, which he identified as April 10, 2006 (but that [M & J’s] evidence identified as having been in late June), he had taken his .22 caliber target pistol inside [M & J’s] physical plant and had placed it inside a padlocked tool box because, he said, his automobile locks were not properly functioning and he ‘was afraid somebody would steal it’ from that vehicle. [Isbell] also testified that, when he had informed his supervisor, Steven Collins, that he had brought the gun into the plant, Collins had stated that [Isbell] ‘didn’t need that in here’ and had directed him to return the weapon to [Isbell’s] vehicle.[1] [Isbell] denied having engaged in horseplay with the firearm or having threatened anyone with it, contradicting other witnesses’ testimony that he had aimed the weapon at Collins several times;[2] further, he denied having received a printed employee handbook or having seen a posted work rule barring fire *12 arms, and he added that [he] knew of two or three other employees who had brought firearms into [M & J’s] plant and that one such firearm had been discharged, but that no one’s employment had been terminated as a result of that conduct.
“Other evidence adduced by [Isbell] tended to corroborate [his] testimony that other employees had brought firearms into the plant on various occasions. John Dooley, a former coworker of [Is-bell’s], testified that he had seen four employees of [M & J] bring firearms into the plant.[3] Shane Bowen, another former coworker of [Isbell’s], testified that he had observed that a number of employees had brought firearms with them to [M & J’s] premises for selling or trading purposes, stating that it had been ‘common practice to buy and trade and sell guns’ because he had worked “with a bunch of hunters,’ but he added that that activity had occurred ‘in the parking lot 90 percent of the time.’ Nonetheless, Bowen also testified that on one occasion he had shown some of his coworkers, including Collins, a firearm in its original display case ‘inside the plant’ and had not been disciplined. Although Bowen testified at his deposition that [M & J] had indeed had a firearms policy and that it was to the effect that ‘[y]ou don’t bring one in the plant,’ on direct examination at trial Bowen testified that he had not seen or heard of a policy to the effect that ‘if you bring a pistol inside the plant you’re going to get fired’; on cross-examination, when confronted with the inconsistency, Bowen admitted that he ‘thought we got a handbook when we first came to ’ work there.’ Importantly, Bowen also testified that Cox, [M & J’s] vice president, had known nothing about the presence of any firearms at the plant.[4]
“[Isbell] also called Greg Burns, another former coworker, as a witness. Burns testified that on one occasion he had observed [Isbell] take a black pistol from a holster and aim it at Collins two or three times while Collins had his back turned to [Isbell]. At that time, Burns, fearing the consequences of a heated confrontation between [Isbell] and Collins that might result from a report that [Isbell] had waved a gun at his supervisor, orally reported to Collins simply that [Isbell] had brought a firearm to the plant and that that made him uncomfortable, after which Collins talked to [Isbell]. Several weeks after having made that oral report, Burns, during a [July 27, 2006,] meeting with Cox, raised the firearm-possession issue again because, he erroneously believed, Cox had known about it, and he disclosed the alleged aiming incident in further detail at that time;[5] Burns, Cox, and Collins then attempted to deduce the date of the occurrence from the length of the work day and the presence and absence of other workers, reaching the conclusion that [Isbell] must have brought the firearm to work in late June 2006.[6]
*13 “Another of [Isbell’s] former coworkers, Randy Cohron, testified that he had observed [Isbell] on the day when he brought the firearm into [M & J’s] plant, although he was unsure of the specific day on which that had occurred; he also did not observe [Isbell] aim the weapon at anyone. Cohron testified that when he observed [Isbell] with the weapon, he told [Isbell] that he could ‘get in trouble for bringing it in,’ ie., that [Isbell] could ‘[g]et wrote up or fired.’ Cohron also testified to knowing of one incident in which a former employee, identified only by the nickname ‘Convict,’ had been fired after bringing a knife into [M & J’s] breakroom during a disagreement with a coworker.[7] Cohron testified on direct examination that on one occasion he had himself purchased a weapon on [M & J’s] property, but he added during cross-examination that that transaction had occurred in the parking lot of the plant.
“Collins testified at trial that Burns had approached him on a Saturday, close to the end of the working day, and had informed him that [Isbell] ‘had a gun in the shop,’ but had not reported that [Isbell] had pointed the firearm at him. At that time, Collins simply instructed [Isbell] to take the firearm out of the plant, but he added that ‘that was before I found out he was pointing it at people.’ Collins also testified that he had not made the decision to terminate the employment of [Isbell]; he assumed that that decision was made by Cox.[8]
“Dooley testified that after it had been determined that [Isbell] would be undergoing carpal tunnel release surgery, he had had a conversation with Collins about [Isbell’s] situation and, according to. Dooley, ‘he wasn’t liking it.’ According to Dooley, Collins made the statement ‘I’m going to find some way to get this out of here’ two or three weeks before [Isbell’s] employment was terminated. Dooley also testified that Collins had subsequently informed him that [Is-bell] had been fired and that ‘[t]he lawyer said we could’ terminate [Isbell’s] employment for ‘[b]ringing a gun in here.’ Dooley admitted, however, that he had been hired by Cox (not Collins) and that he had notified Cox (not Collins) when he decided to cease working for [M & J],
“Cox testified at trial that on July 27, 2006, Burns had first reported that he did not feel safe working in an environment with [Isbell] present because, Burns had said, he had seen [Isbell] take a pistol, point it at Collins, and pretend to shoot him. Cox also testified that he had prior knowledge that [Isbell] did not like Collins. In response to Burns’s report, .Cox summoned Collins, who reported that he had been unaware of [Isbell’s] actions because they had occurred while Collins’s back had been turned to [Isbell]. Cox immediately notified his own supervisor, Lavon Drake ([M & J’s] president in charge of operations), regarding the incident.
“During [M & J’s] case, Frank Hop-son, [M & J’s] chief executive officer and *14 part owner, testified that he had been contacted by Drake, who mentioned having a problem that normally would not be referred to Hopson but for ‘extenuating circumstances.’. Hopson testified that after being informed that several coworkers of [Isbell’s] had made statements to the effect that [Isbell] had had a firearm in the plant and had pointed it at supervisory personnel[9] Hopson had indicated his agreement that [Isbell] needed to be terminated from his employment; it was at that time, Hopson stated, that Drake told him.of [Isbell’s] workplace injury. Hopson did not alter his decision in response to that information; instead, he said, he acted in furtherance of ‘the safety of [his] employees’ because he ‘had no earthly ... way to know the mental state’ of [Isbell] ‘or exactly what went on.’ Hopson directed Drake to have Cox prepare a. report of the incident and made plans to discuss the matter with a Trussville police officer Hopson knew.
“Cox then prepared a memorandum containing accounts regarding [Isbell’s] having brought a firearm into the plant that were provided by Burns, Cohron, and J.C. Pendleton (who later suffered a stroke and was not available to testify at trial); that memorandum, which is dated August 3, 2006, contains the signatures of all four men[10] Cox testified that his purpose in doing so was to ‘convey the information as best I could as to what I was being told so that my boss would be aware of what was happening and the severity of the incident.’[11]
“After a family vacation, Hopson returned to work and discussed the matter with the police officer, after which, Hop-son testified, he made the decision to terminate [Isbell’s] employment. In contrast, Cox testified that he had made a recommendation that [Isbell’s] employment be terminated, and he stated that he, Drake, and Hopson had collectively made the decision to terminate [Isbell’s] employment. [Isbell] was then notified, by a letter dated September 18, 2006, that his employment was being terminated ‘[a]fter careful review of an incident that involved you taking a weapon out of your car in the shop.’ ”
M & J Materials, Inc. v. Isbell, 153 So.3d 1, 4-7 (Ala.Civ.App.2010) (footnote omitted).
At the close of Isbell’s evidence and again at the close of all the evidence, M & J moved for a judgment as a matter of law; the trial court denied those motions. The trial court then instructed the jury on *15 the applicable law, specifically noting, in pertinent part, that for Isbell “to be entitled to recover punitive damages, you first must award compensatory damages[] or nominal damages.” The jury deliberated and returned a verdict in favor of Isbell, awarding $0 in compensatory damages and $75,000 in punitive damages. After the trial court and counsel for both parties noted that the verdict was inconsistent, but before the jury was discharged, the trial court recalled the jury and reminded it that “[f]or a plaintiff to be entitled to recover punitive damages, you must first award compensatory damages or nominal damages.” The trial court requested that the jury state “clearly what [its] intentions [we]re.” The trial court instructed that “[i]f your intentions are to give no compensatory damages, you cannot give punitive damages. If your intention is somehow to give punitive damages, the law supports punitive damages as long as there’s some reasonable finding or nominal finding of compensatory damages.” The trial court sent the jury back to deliberate, and the jury ultimately returned a verdict awarding Is-bell $5,000 in compensatory damages and $70,000 in punitive damages. The trial court entered a judgment on that verdict on November 19, 2008, over M & J’s objection.
M & J appealed to this Court, making three arguments. First, it contended that Isbell had failed to meet his prima facie burden for a retaliatory-discharge claim. Second, it argued that the trial court had erred in rejecting the jury’s first verdict, reinstructing the jury regarding the nature of a proper damages award, and accepting the second verdict.' Third, M & J argued that the trial court should have concluded that the punitive-damages award was excessive under principles enunciated by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). We transferred the appeal to the Court of Civil Appeals pursuant to Ala.Code 1975, § 12-2-7(6).
The Court of Civil Appeals agreed with M & J that Isbell had failed to present substantial evidence of “termination of employment based solely upon the employee’s on-the-job injury and the filing of a workers’ compensation claim.” Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala.2002). In this regard, the Court of Civil Appeals reasoned as follows:
“[W]e do not agree that the record reflects substantial evidence demonstrating that [Isbell’s] employment was terminated solely because of his having made a workers’ compensation claim against [M & J]. As the Alabama Supreme Court indicated in Aldridge, our state’s pertinent statute, Ala.Code 1975, § 25-5-11.1, like that of three other states, *use[s] a formulation ... requiring the discharge to be considered retaliatory be “solely” because of a workers’ compensation claim.’ 854 So.2d at 564. According to Aldridge, the legislature’s choice of the word ‘solely’ to establish the pertinent causation standard indicates an intent to limit the cause of action to situations in which the employer is ““without an independent lawful reason which would justify the otherwise unlawful action.’ ” ’ Id. (quoting Dale v. J.G. Bowers, Inc., 709 N.E.2d 366, 369 (Ind.Ct.App.1999), quoting in turn Watkins v. Sommer Metalcraft Carp., 844 F.Supp. 1321, 1326 (S.D.Ind.1994)). Here, while there was a dispute as to whether [Isbell], in fact, aimed a firearm at his supervisor on multiple occasions in the manner that Burns testified, there is no dispute that Burns reported to Cox (and then to Hopson) that [Isbell] had engaged in such behavior, nor is there *16 any dispute that [Isbell] did bring a firearm into [M & J’s] plant.
“Further, although [Isbell] denied having had knowledge (before Collins told him to return the firearm to his motor vehicle) that possession of a firearm in the plant was contrary to a policy of [M & J] — a policy that was identified by a number of other witnesses as being in force — the record does not reflect that [M & J] has any history of applying a rule barring the taking of weapons into its plant in a discriminatory manner, ie., only to those employees who seek workers’ compensation benefits, nor that [M & J] has any policy barring discharge of employees who bring weapons into its plant. Indeed, both Cox and Cohron testified that a temporary employee identified as ‘Convict’ had been fired for having brought a knife from his vehicle into one of [M & J’s] structures. Further, although there was evidence indicating that a number of employees, including certain employees with supervisory duties, had brought firearms into [M & J’s] parking lot for trade, and even disputed evidence tending to show that such firearms had occasionally been brought into the plant, there is no evidence indicating that Cox and Hopson, the persons who the record indicates were in positions of authority as to personnel matters for [M & J], were aware of any such instances. Finally, there is no evidence tending to show that [M & J’s] personnel with responsibility for hiring and firing have acknowledged that their stated reason for terminating [Is-bell’s] employment was in any way pre-textual.
“As a matter of federal law, entities such as [M & J] have a duty to ‘furnish to each ... employee[ ] ... a place of employment ... free from recognized hazards that are causing or are likely to cause death or serious physical harm.’ 29 U.S.C. § 654(a)(1). We recognize that the great majority of this country’s citizens are responsible stewards of their constitutional rights to keep firearms. See U.S. Const., amend. II; Ala. Const, of 1901, § 26. That said, the potential for ‘death or serious physical harm’ from a firearm in a workplace environment should that firearm conceivably come into the possession of a person who might be unable or unwilling to act responsibly, and the prospect that the employer might suffer legal action in such circumstances, are valid legal concerns that may be considered by an employer confronting an employee who brings a firearm into the workplace. See Hansen v. America Online, Inc., 96 P.3d 950 (Utah 2004) (termination of employment of workers who brought firearms onto property of employer held not contrary to public policy).
“Based upon the foregoing facts and authorities, we conclude that the evidence presented at trial shows that [Is-bell] was not discharged solely on the basis that he had sought benefits under the Act for his workplace injury; in particular, [Isbell] failed to show that [M & J’s] personnel with termination authority applied any policy against the possession of weapons in the workplace in a discriminatory manner only to employees who have filed workers’ compensation claims, acted outside company policy, or disavowed the reason given for [Isbell’s] discharge. For that reason, we must conclude that, under Aldridge, the trial court erred in denying [M & J’s] motion for a [judgment as a matter of law] filed after the close of all the evidence.”
M & J Materials, 158 So.3d at 7-8 (footnotes omitted). The Court of Civil Appeals then reversed the judgment entered on the jury verdict in favor of Isbell and prefer- *17 mitted consideration of M & J’s other challenges to the jury’s verdict.
Isbell filed a petition for a writ of certio-rari asking this Court to review two issues:
(1) whether the Court of Civil Appeals failed to view the evidence in the light most favorable to Isbell for purposes of determining whether he presented substantial evidence that the termination of his employment was based solely on his filing a workers’ compensation claim; and
(2) whether the Court of Civil Appeals misconstrued and misapplied Aldridge in the course of reaching its conclusion.

II. Standard of Review

“This Court applies the same standard of review to a ruling on a motion for a [judgment as a matter of law] as the trial court used in initially deciding the motion. This standard is ‘materially indistinguishable from the standard by which we review a summary judgment.’ Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001). We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to [the nonmovant], would warrant a jury verdict in his favor. If so, the trial court did not err in not granting [the mov-ant’s] motion for a [judgment as a matter of law].... ‘Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Furthermore, “we review the record as of the time the motion for a [judgment as a matter of law] was renewed at the close of all the evidence.’ Alabama Power Co. v. Aldridge, 854 So.2d 554, 561 (Ala.2002).”
Flint Constr. Co. v. Hall, 904 So.2d 286, 246-47 (Ala.2004) (emphasis added).

III. Analysis

We begin by reviewing the respective burdens of the parties on a retaliatory-discharge claim. Alabama Code 1975, § 25-5-11.1, states, in pertinent part, that “[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers’ compensation benefits under this chapter.” This Court explained in Aldridge:
“In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee’s on-the-job injury and the filing of a workers’ compensation claim.”
854 So.2d at 563.
There is no dispute between the parties that Isbell established the first three elements of a retaliatory-discharge claim. The disagreement — and the basis for the reversal by the Court of Civil Appeals — concerns the fourth element, i.e., whether Isbell established that he was fired “solely” because of his workplace injury and the filing of a workers’ compensation claim.
“Because direct evidence demonstrating that an employer has discharged an employee solely because the employee has filed a workers’ compensation claim is not often easily obtained, an employee may establish by circumstantial evidence that the actual reason for the discharge was the employee’s filing of a workers’ compensation claim.”
Hatch v. NTW Inc., 35 So.3d 623, 628 (Ala.Civ.App.2009).
*18 “This Court identified in Aldridge certain factors that can be considered as circumstantial evidence of a causal connection between an employee’s filing a workers’ compensation claim and that employee’s discharged
“ ‘ “1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee’s injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee’s work performance evaluations following a workers’ compensation claim, and 6) evidence that the stated reason for the discharge was false.” ’
“854 So.2d at 564-65 (quoting Chhim v. University of Houston, 76 S.W.3d 210, 218 (Tex.Ct.App.2002)). Furthermore, we observed that ‘[mjany states also consider “[pjroximity in time between the filing of the workers’ compensation claim and discharge” a persuasive factor in establishing a causal connection.’ Aldridge, 854 So.2d at 565 (quoting Rebarchek v. Farmers Coop. Elevator & Mercantile Ass’n, 272 Kan. 546, 555, 35 P.3d 892, 899 (2001)).”
Flint Constr. Co., 904 So.2d at 248.
When the evidence is viewed in the light most favorable to Isbell, the nonmov-ant, it is clear that he presented evidence of several of the above-mentioned factors. As to the first factor, M & J’s chief executive officer, Frank Hopson, testified that he was told about Isbell’s workers’ compensation claim before he made the decision to fire Isbell. M <& J’s vice president, Larry Cox, testified that he filled out the first-report-of-injury form for Isbell’s claim, so he was aware of the claim over three months before he sent Isbell the termination letter. Regarding the second factor, Isbell testified that his supervisor, Steve Collins, harassed him for taking time off work for his doctor’s appointments and physical-therapy visits. Isbell’s former coworker, Greg Burns, testified that Collins was “frustrated with” the fact that Isbell had been off work so much as a result of his injury. Former M & J employee John Dooley testified that after Isbell’s surgery for carpal tunnel syndrome, Collins “wasn’t liking” the situation and that he was “going to find a way to get this out of here,” referring to Isbell. Regarding the “[pjroximity in time between the filing of the workers’ compensation claim and discharge,” 854 So.2d at 565, Isbell was injured June 15, 2006; he was taken off work by his authorized physician on July 17, 2006; and he was fired on September 18, 2006. Thus, Isbell, a nine-year employee with M & J, was fired approximately three months after filing his workers’ compensation claim. Isbell also presented evidence of the third and fourth factors listed in Aldridge, but, to avoid unnecessary duplication, we will review that evidence below when we discuss evidence of pretext.
“Once a plaintiff establishes a prima fa-cie case of retaliatory discharge, ‘ “[tjhe burden ... then shift[s] to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the employee must prove that the reason given by the employer was not true but a pretext for an otherwise impermissible termination.’” Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1122 (Ala.1992) (quoting Twilley v. Daubert Coated Prods., Inc., 536 So.2d 1364,1369 (Ala.1988)).”
Ex parte Wood, 69 So.3d 166, 169 (Ala. 2010).
The reason for Isbell’s termination provided by Larry Cox in the termination *19 letter was “an incident that involved you taking a weapon out of your car in the shop.” In an answer to Isbell’s complaint, M & J stated that Isbell “was terminated for possession of and wielding a firearm within the workplace and property of’ M & J. At trial, it became clear that M & J’s position was that it had'fired Isbell for violating a policy that employees not bring guns into the plant and for pointing the weapon he had brought into the plant at a supervisor. There was a considerable conflict in the evidence as to whether such a policy against bringing guns into the M & J plant actually existed, because no written policy to that effect was produced and some employees professed not to be aware of such a policy. Regardless, it is undisputed that M & J stated a reason for terminating Isbell’s employment independent of his filing a workers’ compensation claim. Once it did so, it was incumbent upon Isbell to demonstrate that the stated reason was a pretext.
This Court explained in Aldridge that
“where a conclusive determination can be made that retaliation is not the sole basis for the discharge a judgment as a matter of law is appropriate. A plaintiff, therefore, has the burden of presenting sufficient evidence indicating that the plaintiff was discharged because he or she filed a claim for workers’ compensation benefits, but if there is uncontradicted evidence of an independently sufficient basis for the discharge then the defendant is entitled to a judgment as a matter of law.... An employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.”
Aldridge, 854 So.2d at 568 (emphasis .omitted).
The Court of Civil Appeals concluded that it was undisputed that Isbell brought a firearm into the plant and, further, that “the record does not reflect that the employer has any history of applying a rule barring the taking of weapons into its plant in a discriminatory manner, ie., only to those employees who seek workers’ compensation benefits.” M &J Materials, 158 So.3d at 7. It is in reaching this conclusion that it appears the Court of Civil Appeals failed to view the evidence in the light most favorable to Isbell.
Isbell testified that he knew of two or three other employees who had brought firearms into the M & J plant and that one such firearm had been discharged, but that no one’s employment had been terminated as a result of that conduct. Dooley testified that he had seen four people with guns inside the plant, including two supervisors, but that none of those employees had been disciplined for violating a company policy. Randy Cohron testified that he once purchased a shotgun from Shane Bowen in M & J’s parking lot. Bowen testified that he had seen a number of employees bring firearms onto M & J’s premises and that it was “common practice to buy and trade and sell guns” there. The Court of Civil Appeals apparently discounted this portion of Bowen’s testimony because he also stated that the buying and selling of firearms, occurred “in the parking lot 90 percent of the time.” Taking Bowen at his word, however, this would mean that some of the time the activity occurred inside the plant. Indeed, Bowen *20 testified that he brought a pistol into the plant once and showed it to other employees, including his supervisor Steve Collins. According to Bowen, Collins did not warn him that he could lose his job for bringing a firearm into the plant. The Court of Civil Appeals apparently discounted this testimony because Collins testified that Bowen showed him the pistol in the parking lot of the plant. Isbell, Bowen, and Collins all testified that Isbell once sold a shotgun to Collins in the M & J parking lot and that no mention was made of a policy that firearms could not be brought into the plant.
Despite all the above-related evidence, the Court of Civil Appeals concluded that Isbell did not demonstrate that the firearms policy had been applied in a discriminatory manner. The primary evidence of a lack of discrimination relied upon by the Court of Civil Appeals was testimony concerning a temporary employee referred to as “Convict,” who was fired after bringing a knife into a breakroom on M & J’s property. Testimony concerning that situation revealed that it was markedly different from the incident in question. As Cohron testified, “[Convict] and another employee got into it in the breakroom, and [Convict] walked out to his car or truck or whatever he was driving and brought a knife in there and threatened to use it on him.” Thus, an altercation occurred, and “Convict” escalated the situation by bringing a deadly weapon into a confined space and threatening to use it on the other employee. The jury could have concluded that this situation was hardly analogous to simply bringing a firearm into the plant, particularly where there was ample evidence indicating that other employees who brought firearms into the plant were not disciplined for doing so.
The Court of Civil Appeals also apparently discounted the clearly substantial evidence that other employees had not been disciplined for bringing firearms onto the premises and even into the plant by noting that Hopson and Cox, the two supervisors directly involved in terminating Isbell’s employment, testified that they were not aware of such instances. This was despite the fact that Isbell testified that an employee once had discharged a weapon in the plant and the evidence indicating that Collins was well aware that employees brought firearms to work on a regular basis. Given the evidence, the jury was free to disbelieve Hopson’s and Cox’s testk mony that they were not aware of their employees’ behavior in this regard. Certainly, the evidence indicating that the only employee allegedly fired for bringing a firearm into the plant was an employee who had filed a workers’ compensation claim could not be ignored simply through protestations from certain supervisors of a lack of knowledge regarding their employees’ practices.
The Court of Civil Appeals also ignored other evidence indicating that M & J’s stated reason for terminating Isbell’s employment was a pretext. The jury heard Isbell testify that he brought the gun to work on April 10, 2006; yet he was not fired for this infraction until five months later, on September 18, 2006.[12] This gap occurred despite the fact that Hopson claimed that he fired Isbell because he had to ensure the safety of his other employees. Even though he professed to be concerned for employee safety, Hopson also admitted that he took a two-week vacation before he decided to terminate Isbell’s employment.
*21 Of course, the other incident involving Isbell that occurred between April 10, 2006, and September 18, 2006, was Isbell’s workplace injury and the filing of his workers’ compensation claim. Indeed, only two days after Isbell had carpal tunnel surgery, on July 25, 2006, Burns met with Cox and told Cox about the gun incident involving Isbell. Burns met with Cox despite the fact that even according to his own recollection the gun incident had occurred a full month earlier, Burns had seen Collins discuss the gun with Isbell the day it occurred, Burns’s anxiety about the gun incident had subsided, and Isbell had been off work since July 17, 2006. The jury could have inferred from the timing of this meeting that the real purpose of the meeting concerned Isbell’s injury, not the gun incident, especially given that the memorandum Cox typed and Burns signed regarding the gun incident stated that Burns told Cox that “Stan [Isbell] may be exaggerating the degree of his wrist injury to his doctor.”
Additionally, Collins testified that he was not aware of a specific policy about not bringing firearms into the plant despite having worked at M & J for 24 years, that he did not tell Isbell that he could be fired for bringing the firearm into the plant, and that he did not tell his supervisor about the incident after it happened because he “didn’t think that much about it.” The jury could have inferred from these statements that bringing a gun into the plant was not a major issue at M & J. In contrast, Cox testified that he recommended firing Isbell when he heard about the gun incident, and Hopson testified that the incident implicated workplace safety, yet neither of them ever asked Isbell about the incident before his employment was terminated.
Finally, on September 18, 2006, at Hop-son’s recommendation, Cox drove Burns to the Trussville Police Department to file an incident report on the gun matter with Hopson’s friend, Lt. Paul Skaggs. This was the same day M & J mailed the termination letter to Isbell, and Cox testified that he could, not remember whether he wrote and sent the termination letter before or after going to the police station. The jury could have concluded that the act of filing an incident report on a matter on the day Isbell was terminated and (according to Isbell) five months after the incident occurred illustrated the pretextual nature of the reason stated for terminating Is-bell’s employment.
In addition to the foregoing, there is the following, as stated in the Court of Civil Appeals’ opinion:
“Dooley testified that after it had been determined that [Isbell] would be undergoing carpal tunnel release surgery, he had had a conversation with Collins about [Isbell’s] situation and, according to Dooley, ‘he wasn’t liking it.’ According to Dooley, Collins made the statement ‘I’m going to find some way to get this out of here’ two or three weeks before [Isbell’s] employment was terminated. Dooley also testified that Collins had subsequently informed him that [Is-bell] had been fired and that ‘[t]he lawyer said we could’ terminate [Isbell’s] employment for ‘[b]ringing a gun in here.’ Dooley admitted, however, that he had been hired by Cox (not Collins) and that he had notified Cox (not Collins) when he decided to cease working for [M & J].”
153 So.3d at 6.
In a retaliatory-discharge action, “[t]he plaintiff must prove ‘a causal connection between the workers’ compensation claim and the subsequent discharge in order to establish a prima facie case’ of retaliatory discharge.” Webb Wheel Prods., Inc. v. Hanvey, 922 So.2d 865, 871 *22 (Ala.2005) (quoting Aldridge, 854 So.2d at 563). In reviewing the circumstantial evidence Isbell presented to show a causal connection, we conclude that the Court of Civil Appeals erred by failing to view the evidence in the light most favorable to Isbell. When viewed in that light, Isbell clearly presented substantial evidence showing that M & J’s stated reason for terminating his employment was a pretext for the actual reason, i.e., his workplace injury and his filing a workers’ compensation claim.
In addition to its evidentiary error, it appears that the Court of Civil Appeals also misinterpreted and misapplied Al-dridge. In its analysis, the Court of Civil Appeals stated that “the record does not reflect that [M & J]. has any history of applying a rule barring the taking of weapons into its plant in a discriminatory manner, ie., only to those employees who seek workers’ compensation'benefits.” M & J Materials, 153 So.3d at 7. The Court of Civil Appeals repeated this observation later in its analysis, stating:
“[W]e conclude that the evidence presented at trial shows that [Isbell] was not discharged solely on the basis that he had sought benefits under the Act for his workplace injury; in particular, [Is-bell] failed to show that [M & J’s] personnel with termination authority applied any policy against the possession of weapons in the workplace in a discriminatory manner only to employees who have filed workers’ compensation claims.'...”
153 So.3d at 8 (emphasis omitted).
In these quoted passages, the Court of Civil Appeals apparently construed Aldridge as requiring that an employee demonstrate that the stated basis for his or her termination from employment has been applied in a discriminatory manner only to other employees who have filed workers’ compensation claims as a precondition to establishing that it has been applied in a pretextual manner as to the employee at issue. The language from Aldridge the Court of Civil Appeals relies upon is as follows:
“An employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating ... that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims.”
854 So.2d at 568.
As we related above, the pertinent facts in the present case are not undisputed. More importantly, however, the foregoing language from Aldridge does not stand for the proposition that the only way of establishing discriminatory application of a stated reason for termination from employment (i.e., pretext) is by establishing previous instances of wrongful discrimination. Indeed, the implication of such a reading would be at odds with the purpose of § 25-5-11.1, which is to prevent discrimination against employees who file workers’ compensation claims. In order for there to be second and third instances of discrimination based “solely” on the maintenance of a workers’ compensation claim, there logically must be a first instance of such discrimination. The first instance of such discrimination would be illegal under § 25-5-11.1 for the same reason that subsequent cases of discrimination would be illegal: Those instances of discrimination would use the stated reason for discharge as a pretext for the true illegal reason of retaliatory discharge. A reading of the statute that required evidence of previous incidents of discrimination against employees with workers’ compensation claims would allow *23 the employer one free case of discrimination in using the stated reason as a pretext. Such a conclusion simply has no foundation in § 25-5-11.1 or in Aldridge.
Moreover, the opinion of the Court of Civil Appeals creates the impression that this Court held in Aldridge that an employer is entitled to a judgment as a matter of law merely because it offers evidence of an independent and lawful reason that could otherwise justify termination of employment. Aldridge does not stand for such a proposition. It states that “where a conclusive determination can be made that retaliation is not the sole basis for the discharge a judgment as a matter of law is appropriate.” 854 So.2d at 568 (first emphasis added). In other words, for the movant to be entitled to a judgment as a matter of law, the evidence pertaining to whether there was an independent and lawful reason for the employee’s termination must be such as to require a finding as a matter of law that the proffered reason was in fact a reason for the employee’s termination. See also Flint Constr. Co., 904 So.2d at 250-51 (rejecting the employer’s claim “that by presenting evidence of its legitimate reason for discharging Hall, it has rebutted any inference of retaliation raised by Hall’s initial showing”).[13] Indeed, this is not the first time this Court has rejected this line of reasoning. See, e.g., Ex parte Wood, 69 So.3d at 170, 172 (concluding that the opinion of the Court of Civil Appeals “conflicted] with prior caselaw” because even if the plaintiff’s actions might have provided “a legitimate reason” for discharge, “ ‘[w]e cannot say as a matter of law that the [trial court] could not have concluded that [the employer’s] stated reason for [terminating Wood’s employment] was pretextual without impermissibly reweighing the evidence’ ” (quoting Flint Constr. Co., 904 So.2d at 252)).
Based on the foregoing, we conclude that the Court of Civil Appeals erred in concluding that the trial court should have entered a judgment as a matter of law in favor of M & J. The decision of the Court of Civil Appeals conflicts with prior case-law, and its judgment is due to be reversed.
Our reversal of the judgment of the Court of Civil Appeals on the issue of Isbell’s prima facie case for retaliatory discharge revives two issues M & J argued in its appeal of the jury verdict that the Court of Civil Appeals did not reach. In its appeal, M & J contended that the trial court erred when it reinstructed the jury after the jury initially returned an inconsistent verdict rather than ordering a new trial. It also contended that the punitive-damages verdict of $70,000 was excessive under the factors for evaluating the exces-siveness of such an award provided in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). Because the judgment of the Court of Civil Appeals pretermitted consideration of those issues, we remand the case to the Court of Civil Appeals for consideration of those issues. See Ex parte Wood, 69 So.3d at 172.

-IV. Conclusion

The Court of Civil Appeals erred in reversing the trial court’s denial of M & *24 J’s motion for a judgment as a matter of law and instructing the trial court to enter a judgment in M & J’s favor. Therefore, we reverse the Court of Civil Appeals’ judgment and remand the case to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and STUART, BOLIN, PARKER, SHAW, MAIN, and WISE, JJ„ concur.
BRYAN, J., recuses himself.*

. It is undisputed that Isbell did, in fact, return the gun to his vehicle.

. Although the Court of Civil Appeals states that other witnesses testified that Isbell had aimed the weapon at Collins, as best we can determine from the record, only one witness, Greg Bums, testified to that effect.

. Dooley testified that two of the four employees he was aware of who had brought firearms into the plant were supervisors.

. It is unclear how Bowen allegedly knew the state of Cox's knowledge, particularly concerning incidents involving persons other than Bowen.

. Burns testified at trial that by the time of the July 27, 2006, meeting, he was not feeling any anxiety regarding the firearm incident.

. Specifically, Bums, Cox, and Collins believed that the incident had occurred on June 30, 2006. Isbell testified, however, and M & J concedes on appeal, that Isbell was not at work on June 30, 2006, because he took workers’ compensation leave that day.

. Specifically, Cohron testified that ‘‘[Convict] and another employee got into it in the break-room, and [Convict] walked out to his car or truck or whatever he was driving and brought a knife in there and threatened to use it on him.”

. Additionally, Collins testified that he was not aware of whether M & J had a written policy concerning bringing guns into the plant. He also stated that he was not aware of anyone else ever having been fired for doing so. Collins also confirmed that he had once sold a gun to Isbell in the parking lot of the plant.

. On cross-examination, Hopson admitted that only one émployee told him that Isbell had pointed the gun' in the direction of a supervisor.

. In addition to information about the gun incident, the memorandum related that Bums had told Cox that "Stan [Isbell] may be exaggerating the degree of his wrist injury to his doctor.”

. At trial, Bums admitted that his testimony as recounted in the August 3, 2006, memorandum contained several errors. Specifically, Bums reported in the memorandum that Is-bell pulled his track inside the M & J plant the day of the incident, that he saw Isbell remove the gun from his truck, and that Bums "did not feel safe working in an environment with [Isbell] present.” In his trial testimony. Burns stated that- Isbell had not pulled his track inside the plant on the day of the incident, that he witnessed Isbell pull the gun from his toolbox but had not seen Isbell bring the gun into the plant, and that he was not feeling any anxiety about the incident on the day he spoke to Cox about it. Likewise, Cohron reported in the memorandum that he had seen Isbell "with a pistol he removed from his vehicle," but at trial he testified that he had not seen Isbell remove it from his vehicle and that he had noticed Isbell with the gun in the doorway of the plant, not inside the plant.

. Even if. we could assume the jury believed the conflicting testimony that the incident occurred in late June, there still would have been a gap of almost three months.

. Because Alabama law permits an employer to terminate an at-will employee "with or without cause or justification ... or [for] no reason at all,” Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1121 (Ala.1992), the Court of Civil Appeals’ construction of Al-dridge would effectively mean that an employer has a conclusive independent and lawful reason for discharging an employee simply because he was discharged.